[No. 21188.   In Bank.—January 5, 1895.]

IN THE MATTER OF THE DISBARMENT OF HORACE W. PHILBROOK, AN ATTORNEY AT LAW.

ATTORNEY AT LAW—VIOLATION OF DUTY—CONTEMPT OF COURT—SUS-
PENSION.—Where an attorney at law has filed in the supreme court a
brief in which he has violated his duty as an attorney by the use of
unwarrantable language in assailing a justice of the supreme court, with
intent to commit a contempt of the court, and by palpably attempting
to influence the decision of the court by appeals to the supposed timidity
of its justices, the attorney guilty of the same should be suspended from
his office as an attorney at law.

PROCEEDINGS in the Supreme Court for the suspension of Horace W. Philbrook as an attorney at law.

*R. Y. Hayne*, for the Prosecution.

*Horace W. Philbrook, in propria persona, contra.*

On the seventh day of December, 1894, the court filed the following order:

" " It has come to the attention of the court that one Horace W. Philbrook, an attorney at law authorized to practice in this court, did, upon the thirtieth day of November, A. D. 1894, file a certain brief in a certain cause then pending in this court, numbered 15,857, and entitled *Ira P. Rankin, special administrator of the estate of John Levinson, deceased, plaintiff and appellant,* v. *William J. Newman and Benjamin Newman, defendants and respondents,* in which said brief there are found matters which in the mind of the court are of a scandalous and contemptuous character.   The said scandalous and contemptuous matters are found upon the pages of said brief, commencing at page 313 thereof and extending consecutively down to and including a portion of page 379 thereof, and the whole tenor of said matter may be fairly illustrated by the following excerpt taken from pages 377 and 378:

" 'It is not enough for courts of justice to be, in fact, pure.   In addition to the fact there must exist the full-

est confidence in their purity. It is not enough for judges to be, in fact, strong enough to resist temptation. They must not allow themselves to be tempted. Examine carefully and thoroughly the secret transaction of September 6, 1890. It was without an extenuating circumstance. You have before you here the proof of what its contrivers and users think of courts of justice and of judges. You behold their evil and most contemptuous confidence. They rely solely upon the corrupting force of their corrupt contrivance, the secret transaction of September 6, 1890; and solely upon that reliance they have been ever since September 6, 1890, and still are, as confident of a final judgment for the Newmans as if they already had it locked up at home. And is it not probable then that many others think with them that the courts may be corrupted, the judgments of judges perverted, and that others, still more numerous, suspect it? But if this secret transaction of September 6, 1890, is not declared illegal and void upon the rules and principles declared in *Egerton* v. *Earl Brownlow*, then all to whom knowledge of the case shall come will no longer merely suspect or even think that the courts may be corrupted; they will know it; they may point to the decision here as full proof of it; for it will be established that such practices are permissible, and if permissible they are sure to have effect.'

" By reason of the foregoing premises it is therefore ordered that he, the said Horace W. Philbrook, appear before the court on the seventeenth day of December, A. D. 1894, at 10 A. M., at the courtroom thereof, in the city and county of San Francisco, and at that time show cause why he, the said Philbrook, should not be removed from his office as an attorney at law, and disbarred from further practicing before the courts of this state, for having violated his oath and duties as an attorney of this court in filing the said brief.

" It is further ordered that a certified copy of the foregoing order be forthwith served upon said Horace W.

Philbrook by the bailiff of this court, and due return
made thereof.        BEATTY, C. J.,        FITZGERALD, J.,
                " McFARLAND, J.        DE HAVEN, J.,
                "GAROUTTE, J.,        VAN FLEET, J."

Further facts are stated in the opinion of the court.

The COURT.—Horace W. Philbrook, a licensed attor-
ney, having filed in this court a certain brief, in which
he appeared to have violated his duty as an attorney, was
cited to appear before the court on the seventeenth day
of December, A. D. 1894, at 10 o'clock A. M., to show cause
why he should not be removed from his office as an at-
torney at law, and disbarred from further practicing law
before the courts of this state. The citation was served
on him ten days previous to said December 17th. On
said day he appeared, and as he did not ask any continu-
ance, but announced himself ready, the matter was pro-
ceeded with. A committee from the Bar Association of
San Francisco requested to be allowed to appear " for the
purpose of seeing that said matter is properly presented,"
and their request was granted. The respondent, Phil-
brook, filed a written answer to the citation, and he was
allowed to make an oral argument in his own defense,
without restriction of time, his argument occupying the
greater part of two days. The committee of the Bar As-
sociation argued that he should be disbarred. In the
citation attention was called to certain pages of the brief
which contained the objectionable matter, and a part of
it was quoted. The respondent did not offer any apology
or make any excuse; but in his written answer, and in
his oral argument, he boldly contended that his brief
was unobjectionable and contained nothing which he
had not the right to put there. His argument was, for
the most part, a reiteration of the assertions and lan-
guage of the brief.

The brief in question was filed by said Philbrook as
attorney for the appellant in a certain action now pend-
ing here on appeal, No. 15,857, entitled, "*Rankin, special*

*administrator of the estate of John Levinson, deceased, plaintiff and appellant,* v. *Wm. J. Newman and Benjamin Newman, defendants and respondents."* Levinson, deceased, had, in his lifetime, been a copartner with the said Newmans, under the firm name of Newman & Levinson; and said action grew out of a difference about the settlement of the business and affairs of the partnership, and was decided by the trial court in favor of the Newmans. A motion for a new trial had been made by Philbrook's client in the trial court, and had been there denied; and the appeal was taken from the order denying the motion for a new trial. This appeal has not yet been argued or submitted in this court, and its merits are not before us, although the transcript in the case, and also the transcripts in two other appeals between the same parties, in which the Newmans were also successful in the trial court, are made parts of the said Philbrook's answer in this present proceeding.

The objectionable parts of the said brief for which respondent, Philbrook, was cited as aforesaid consist mainly: 1. Of offensive, scandalous, and contemptuous language concerning Hon. Ralph C. Harrison, one of the justices of this court; and 2. Of language contemptuous of all the other justices of the court, in that it broadly intimates that they may be improperly influenced in deciding said appeal, and boldly threatens them with evil consequences to themselves if they should decide the appeal adversely to the appellant. It also contains language highly reprehensible concerning the learned judge of the superior court who heard and determined said action at *nisi prius,* and his answer contains such language concerning another learned judge of the superior court who decided the other cases mentioned in said Philbrook's answer.

During the year A. D. 1890 the Hon. Ralph C. Harrison, now a justice of this court, was, and for many years prior thereto had been, a practicing lawyer at the San Francisco bar; and during nearly all of that year he was the attorney of one Raveley, executor of said

John Levinson, deceased, above mentioned.    On the
sixth day of September of that year (1890) a settlement
was made by and between the said executor, Raveley,
and the surviving partners, the said Newmans, at which
two certain paper writings were executed, which were
in the handwriting of Justice Harrison, and signed by
him as a witness.    There were articles of copartnership
of the said firm of Newman & Levinson, existing and
in force at the time of the death of Levinson, which
provided, or at least purported to provide, for the dispo-
sition of the interest in the firm property and business
of either partner upon his death.    At that time, and
prior thereto, the respondent here, Philbrook, was the
attorney for certain legatees of said Levinson, and it
appears that Philbrook thought that the estate was
entitled to a share of the " goodwill " of the said firm,
while Justice Harrison was of the opinion that under
the said articles of copartnership the estate of Levinson
had no interest in the goodwill, but was entitled only
to its share of the partnership property, to be ascer-
tained as provided in said articles.    It is clear that this
was the only point of difference existing at the time of
said settlement.    It was a pure question of law, as to
which it was the duty of Justice Harrison to advise his
client—the executor—according to his best judgment.

But it happened that a few weeks before the said 6th
of September Justice Harrison had been nominated by
one of the two leading and nearly equally powerful
political parties of the state as a candidate for the office
of associate justice of the supreme court, and upon this
circumstance respondent, Philbrook, has built up in his
imagination a gigantic conspiracy, which, he contends,
gives him the right, under the claim of free argument,
to assail Justice Harrison while a member of this court
by every offensive epithet which his somewhat wide
vocabulary supplies, and to ascribe to him the vilest
motives and conduct.    He assumes and asserts that
Justice Harrison, his client Raveley, the Newmans, and
their attorneys, Reinstein and Eisner, entered into a

conspiracy to do a wrong, which conspiracy was founded upon the considerations that the former had been nominated as a candidate for justice of this court, that he was practically sure of election, and that if he should draw up said paper writings, and witness them, any superior judge, before whom any litigation concerning the matter might come, would be deterred from doing right by the knowledge that one of the conspirators was a justice of the supreme court, and that upon appeal the other justices of this court would be swerved from their duty because one of the alleged conspirators would be associated with them on the bench. And it is contended that on account of this imaginary state of facts, founded on no evidence, and without any probable cause, respondent had free rein to indulge in whatever insulting and contemptuous language his fancy may conjure up concerning a justice of this court.

It is impracticable to here reproduce any considerable amount of the language used in the brief; but a few specimens will be quoted. Having characterized Justice Harrison as one of the chief conspirators, he denounces what he calls the "secret transaction of September 6th" as "this most impudent and unspeakably wicked scheme." Having said, "There they all were, Ralph C. Harrison, Milton S. Eisner, William J. Newman, Benjamin Newman, and executor Raveley, secretly assembled solely by reason of the fact that Ralph C. Harrison was about to become a justice of the supreme court," etc., he asks: "Could a more villainous deed than that be conceived"? He speaks of Justice Harrison and the others as "corrupt, depraved, and wicked persons," and of the former as "*particeps criminis.*" And again he says: "It was done criminally; and it was necessary to the scheme that Ralph C. Harrison should become a justice of the supreme court." Again, he says that "every man present at that secret transaction of Saturday, September 6, 1890, knew what they were all about; knew that he was a participant in one of the foulest and blackest of crimes; that he was helping plant a

dagger for the breast of justice." Again, speaking of
that transaction, he asks: "Can it be that we shall find
in it a clew to the secret of supreme success, the very
crown of success, in the practice of the law"? And
again: "Why expect men to wear themselves out with
the intemperate study of law books, as they have hith-
erto been written, when there is open the easier, surer,
and more profitable field of low cunning by which help-
less women and fatherless children may be betrayed, rob-
bed, and made outlaws by one single stroke"? Again,
he asks how far matters have gone "when so vile a
scheme is contrived to pervert the courts, when it
raises it head openly, plants its vile body openly in the
very temple of justice, wears no other disguise than
unblushing audacity and brazen impudence."

The foregoing quotations give a fair idea of the char-
acter of the brief, and of the temper and *animus* which
inspired it; and in all that respondent has presented,
in his answer, in his argument, and in the several tran-
scripts which he made parts of his answer, he has been
unable to show any ground, any decent pretext, for the
outrageous verbal assaults which he has made upon a
member of this court. Nothing appears in connection
with the transaction so often alluded to in the brief
which places Justice Harrison in any other light than
that of an upright and honorable lawyer, faithfully at-
tending to the interests of his client, and advising him
according to his best judgment. He also gave some
testimony at the trial; but section 282 of the Code of
Civil Procedure enjoins upon an attorney " to abstain
from all offensive personality, and to advance no fact
prejudicial to the honor or reputation of a party or wit-
ness unless required by the justice of the cause with
which he is charged." The parts of the brief to which
we have alluded are, therefore, contemptuous and
unbearable, and entirely unwarranted under any claim
of free speech. We appreciate the right of counsel to
fully argue their cases, to comment on witnesses who-
ever they may be, and to present views and press ar-

guments within any reasonable bounds of propriety.
There need be no difficulty in this court on that sub-
ject.   It would be hard, no doubt, to designate a line
that would in all cases properly divide free speech from
license.   But there is no trouble in the case at bar on
that score, for the conduct of the respondent is, beyond
doubt, entirely on the side of unbridled license.   Of
course, the fact that an attorney has been elected a jus-
tice of this court does not shield him from any fair
criticism of his conduct when an attorney; but, when
there is such unwarrantable language as that used by
respondent, it is manifest that it was used *because* the
person assailed was a justice of this court, and with in-
tent to commit a contempt of this court.   As respondent
has, in the same connection, assailed not only all the
members of this court and the two superior judges above
referred to, but also certain reputable lawyers who were
at one time associated with him in the litigation, and
a special administrator who was appointed at his own
instance and out of his own office, charity might possibly
suggest that he is the victim of abnormal suspicion and
distrust.   But no such defense is made; and, moreover,
his brief and argument show a bright intellect and a
clear mind.   His conduct, therefore, exhibits only a
sheer intent to be maliciously contemptuous.

With respect to the other members of the court the
language of the brief is not only generally contemp-
tuous, but contains a direct attempt to influence them by
threats of injury unless they shall adopt his views of
the case.   He says in his brief:/"And let this be borne
in mind by every justice who takes part in the decision:
You were not, any more than I, either directly or in-
directly a party to the secret transaction of September
6, 1890, ' and we that have free souls, it touches us not.'
It will never be in any, even the slightest, degree your
act, your child, nor will you in even the slightest degree
be responsible for it, *unless you adopt it as your own.*
Though it is a lure, prepared to be held out to you as a
lure, it touches you not *unless you accept it.*"    And

again, having said that it is not enough for courts to be
pure, but that there must be " the fullest .confidence in
their purity," he says: ." But if this recent transaction
of September 6, 1890, is not declared illegal and void
upon the rules and principles declared in *Egerton* v. *Earl
Brownlow*, then *all to whom knowledge* of the case may
come will no longer merely *suspect* or even think that
the courts may be corrupted; *they will know it;* they
may point to *the decision here* as full proof of it; for it
will be established that such practices are permissible,
and if permissible they are sure to have their effect."
This is a palpable attempt to influence a decision of this
court by base appeals to the supposed timidity of its
justices, and made, too, by an officer of the court.  It is
intolerable.   It cannot be suffered by any occupant of
the bench who has a just sense of his duty to the people
to preserve the due dignity of their courts, and the
free course of justice.   An attempt to influence a judge
through fear of physical injury is no graver offense
than such an attempt against his reputation.   A high-
spirited man might have perfect physical courage and
yet might possibly, despite all his efforts against it, be
to some extent insensibly affected by dread of the loss
of his reputation and good name.   Neither attempt can
be for a moment countenanced without a manifest
injury to the cause of justice. When people come
into courts as litigants they have the right to expect the
best judgments of their judges, uninfluenced except by
legitimate arguments made openly before them by coun-
sel.   They must expect those errors which will some-
times inevitably be committed by minds which are not
infallible; but they should be able to feel sure that the
impartiality of the court will not be disturbed by any
influence of fear or favor.   And clearly nothing *tends*
more to disturb that impartiality than a menace that the
decision of a cause a certain way will destroy or greatly
injure the good name of the judge who shall make it.
And when the punishment of such an offense is clearly
within the jurisdiction of the court, as in the case of

one of its own officers, it must impose the penalty or neglect its imperative duty.

We exceedingly regret the necessity of this proceeding. It would have been much more agreeable for us to have devoted the time given to its hearing to other business. But to have overlooked it would have been to violate our duty, invite future disrespect and indignities, and establish a precedent which would have embarrassed the court if offenses of a similar character should be called to its attention in the future. It may be not out of place to say that we have been lenient to the respondent for past offenses of a character similar to the one now before us, though not so flagrant; and that his attention has heretofore been directly called to his disregard of his duties as an attorney in this respect. In a petition for rehearing he used disrespectful language towards a commissioner of the court who had prepared the opinion in the case, for which, perhaps, he should have been called to account at the time; and more recently we were compelled to strike out his brief in another case for disrespectful language. And even now we regret that we cannot see some escape from the necessity of imposing the penalty which seems to be imperatively demanded.

Our conclusion is that by filing said brief the respondent, Philbrook, has violated his duty as an attorney "to maintain the respect due to the courts of justice and judicial officers," and to abstain from offensive personality, and to advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he is charged," as declared in section 282 of the Code of Civil Procedure; and that for such reason he should be suspended from his office of attorney at law.

It is ordered and adjudged that the said respondent, Horace W. Philbrook, be, and he hereby is, suspended from his office as attorney and counselor at law, and prohibited from practicing as an attorney and counselor at law in any and all of the courts of this state for the

period of three (3) years from this date, and thereafter until the further order of this court removing such suspension.                  FITZGERALD, J.,    McFARLAND, J.,
                         GAROUTTE, J.,      VAN FLEET, J.,
                              DE HAVEN, J.

On January 10, 1895, BEATTY C. J., filed the following concurring opinion:

BEATTY, C. J.—My views of this case differ in some particulars from those of my associates.

It was not because of Mr. Philbrook's assault upon a member of this court—gross and unjustifiable as I deemed it to be—that I joined in the order citing him to show cause. So far as that part of his offense was concerned I should have waited until the final determination of the appeal in *Rankin* v. *Newman*, before deciding what, if any, action it was necessary or proper to take.

But, as is clearly shown in the opinion of the court (*In re Philbrook*), Mr. Philbrook did not confine himself to an assault upon Justice Harrison in his character of attorney for Levinson's executor, and as advisor and participant in the settlement of the executor with the surviving partners. He went much further: he distinctly threatened the other members of the court with public infamy and disgrace if they did not decide the cause of *Rankin* v. *Newman* in his favor. This he did, not only in the express terms of that part of his brief set forth in the citation, but indirectly and by every sort of implication through page after page of that portion of his brief to which his attention was directed by the reference to said pages.

In his long and carefully prepared answer in writing Mr. Philbrook makes no retraction or qualification of this objectionable language, but, on the contrary, distinctly reavows every thing he has said.

He claims—and I fully concede the claim—that if a justice of this court has been a party, or attorney, or

witness, or in any other manner so connected with a cause which is on appeal here as justly to subject him to criticism, counsel charged with the presentation of such cause must be allowed the same freedom of criticism as in the case of any other person. But the logic of this proposition is that the fact that such party or witness is a member of this court is wholly irrelevant: it has nothing to do with the case. Mr. Philbrook, however, does not hold himself bound by the logic of his proposition. He does not criticise Justice Harrison's conduct as attorney for Levinson's executor the same as if he were not a member of this court, but apparently *because* he is a member of the court he assails him with the bitterest invective, for the purpose of giving point and force to the proposition to which his whole argument tends, that we cannot affirm the order of the superior court without making ourselves participants of the fraud which he charges, and thereby giving all men reason to know that the courts of the country are corrupt.

In this consists the offense of which, in my opinion, the court was compelled to take cognizance on its own motion—a step to which, I may say, we resorted with great reluctance. The law which in such cases makes us the judges of offenses against the court places us in an extremely delicate and invidious position, but it leaves us no alternative except to allow the court and the people of the state, in whose name and by whose authority it acts, to be insulted with impunity, or to exercise the authority conferred by law for the purpose of compelling attorneys to "maintain the respect due to courts of justice and judicial officers."

If an attorney were to approach a court or a judge with the offer of a bribe to decide a cause in his favor, or if he were to menace a judge with personal violence or pecuniary loss if he decided against him, it cannot be doubted that all men would concede the propriety of depriving him of his privileges as an attorney, and if this is so it cannot be denied that some penalty is in-

curred by an attorney who reinforces his argument by announcing to the court with endless repetition that an adverse decision will make the judges participants of a fraud and sharers in the infamy of its perpetrators.

It is not necessary, however, to elaborate this proposition here. It is plainly enough set forth in the opinion of the court, and does not even need exposition, for it must be obvious to the meanest apprehension that threats or menaces of any character addressed to a court as a part of, or in aid of, the argument upon the law and facts of a case is an obstruction to the free and unbiased consideration which every cause should receive; and that if such means of influencing the action of the court should become common, as they might if allowed to pass unrebuked, no rights would remain secure.

Mr. Philbrook himself, by his tardy disclaimer, made in the course of his oral argument, seems to admit the justice of these views.

But as above stated he makes no disclaimer or retraction in his written answer to the citation, which remains a public record of the court. On the contrary, he therein deliberately reaffirms and insists upon the propriety of every word contained in his brief. He claims, of course, never to have understood until his attention was called to it by a brother attorney during a recess of the court taken just before the close of his argument, that he was charged with having menaced the judges with any disagreeable consequences to themselves in case of an adverse decision. He asks us to believe that, with one of the most offensive passages of his brief set before his eyes in the terms of the citation, and with ten days for the careful reconsideration which he says in his answer he has given to the matter, he never saw what is patent to the observation of every one else.

It is difficult to credit Mr. Philbrook with such simplicity of understanding, but it may be true that he has become so blinded by his animosity against Justice

Harrison, and so dominated by the belief that the " secret transaction of September 6, 1890," as he terms it, was a gross and wicked fraud, that he has lost the capacity of regarding any other aspect of the case. Indeed his conduct during the hearing of the citation would seem to indicate that this is so. For, after devoting the greater part of two days to a vindication and renewal of his assault upon Justice Harrison, he interrupted the course of his argument for a few moments to inform the court that during the recess a brother attorney in whom he had confidence had informed him that to some minds the language of his brief might convey the idea of a threat. He, however, professed not to see it even after his attention had been so directed to the matter, but offered, if the court differed with him, to cancel the offensive passages in the briefs on file, and in those which he had distributed among his friends.

In my opinion this retraction was wholly insufficient. Mr. Philbrook had not only been informed by a brother attorney of the offensive construction which might be put upon his brief, he had been notified at the opening of the proceedings by the argument of Mr. Hayne that such was the construction placed upon it by the committee of the Bar Association, and he was plainly informed from the bench that it was understood in the same way by the court. If, in spite of these plain intimations he was still unable to see what was so clearly apparent to others, it ought to have occurred to him that he would do well to take further advice of those in whom he had confidence as to the propriety of modifying his written answer, and of introducing into that permanent record a plain and unequivocal retraction or disavowal of the intention to threaten the court. That he has never done so, nor offered to do so, leaves his offense entirely unmitigated in my eyes, and imposes upon the court the necessity of inflicting the due penalty. As to the character of the penalty I concur in the view of the court that it should be suspension of his privileges as an attorney.

Upon the other branch of the case I should have had nothing to say if Mr. Philbrook had not, by devoting himself to that exclusively and ignoring every thing else, challenged the judgment and opinion of the court. Under the circumstances I cannot pass it over in silence without seeming to dissent from the views of my associates, and, therefore, I feel bound to add that, while I fully concede the right of Mr. Philbrook to attack the settlement between Levinson's executor and the Newmans, and to argue the propositions of fact and of law upon which he arraigns the conduct of Justice Harrison, I see nothing in the case to justify the conclusion that the advice given to the executor as to the construction of the partnership agreement, and his duty to settle according to such construction, was not entirely proper.

The proposition of law for which Mr. Philbrook contends, viz: That notwithstanding such settlement may have been entirely free from fraud, in fact it must be held fraudulent in law—a constructive fraud—because advised and witnessed by a gentleman who was then a candidate for the supreme bench, is one which it is open to him to argue, and since it is involved in the appeal of *Rankin* v. *Newman*, I express no opinion concerning it.

It appears from Mr. Philbrook's own showing that at the time of the settlement neither he nor his clients, the mother and sisters of Levinson, were claiming or had ever suggested that the articles of partnership were invalid. On the contrary, they were then and afterwards asserting their validity and claiming under them. Nor did they then claim or suggest that the inventory made in pursuance of the said articles was false or incorrect in any particular, except in the omission of the item of the "goodwill," the whole controversy being merely as to the proper construction of an agreement, then conceded to be valid and binding, with reference to the single question whether or not it embraced or excluded the "goodwill." As to this matter the difference between them was open, express, and well under-

stood, and there is not the slightest reason to suppose that Judge Harrison's opinion was less honest or less sound than that of Mr. Philbrook. Mr. Philbrook, indeed, is not entirely consistent with himself in this matter, for, unless I have misapprehended his position, he is now claiming that the Newmans, by the exercise of undue influence, induced their dying and partially demented partner to execute an agreement which sacrificed his interest in the goodwill; and, if this is so, it is scarcely consistent to claim that Judge Harrison misconstrued it, or that he can be blamed for the advice given to the executor at a time when neither Mr. Philbrook nor any one else had ever suggested fraud or undue influence in the procurement of the agreement.

I concur in the judgment.

Rehearing denied.