**STANDING COMMITTEE ON DISCIPLINE OF the UNITED STATES DISTRICT COURT FOR the CENTRAL DISTRICT OF CALIFORNIA, Petitioner,**

v.

**Stephen YAGMAN, Respondent.**

**No. CV 94–6448 ER, JGD, DWW.**

United States District Court,
C.D. California.

May 18, 1994.

Robert F. Lewis, Graham E. Berry, Michael Silk, Matthew D. Berger of Lewis, D'Amato, Brisbois & Bisgaard, Los Angeles, CA, for petitioner.

Ramsey Clark, Lawrence W. Schilling, New York City, Marion Yagman, Yagman & Yagman, Venice, CA, for respondent.

Before RAFEEDIE and DAVIES, District Judges, and DAVID W. WILLIAMS, Senior District Judge.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER THEREON

PER CURIAM:

On August 13 and September 10, 1993, this three-judge panel conducted hearings on its Order to Show Cause why Respondent, attorney Stephen Yagman, should not be disciplined pursuant to the Local Rules of the Central District of California. The Panel has reviewed the evidence presented by the parties and the written arguments of counsel. In this order, the Panel finds that the Respondent violated Local Rule 2.5.2 by impunging the integrity of the court and by interfering with the random selection of judges. The Panel defers the determination of the appropriate sanction pending further comment by the parties.

### FACTUAL BACKGROUND

On February 4, 1991, Respondent filed a motion to disqualify then-Chief Judge Manuel L. Real in the case of *Yagman v. Republic Insurance*, CV 91–423 R. Respondent was the party plaintiff in that action.

The motion was assigned randomly to Judge William D. Keller. On March 27, 1991, Judge Keller denied the motion. *See Yagman v. Republic Insurance*, 136 F.R.D. 652 (C.D.Cal.1991). Judge Keller then issued an order to show cause why Respondent should not be sanctioned. Respondent had failed to bring to Judge Keller's attention the fact that another Court had considered and rejected an earlier attempt by Respondent to disqualify Judge Real. Pet.Ex. 42.

In an order filed May 31, 1991, Judge Keller found Respondent in violation of Fed. R.Civ.P. 11, 18 U.S.C. § 401(3) and the inherent authority of the court. *Yagman v. Republic Insurance*, 137 F.R.D. 310 (C.D.Cal.1991). Judge Keller recommended

to the State Bar of California that Respondent be disciplined appropriately.[1]

These proceedings arise from the actions taken by Respondent after the issuance of the May 31 order.

In early June, a reporter from the *Los Angeles Daily Journal* telephoned Judge Keller's chambers to report that she had a written statement from Respondent charging Judge Keller with anti-Semitism and with being "drunk on the bench." 8/13/93 Tr. at 35. The reporter inquired whether Judge Keller cared to comment on the allegations.

In the June 6, 1991 edition of the *Los Angeles Daily Journal,* Respondent was quoted as stating that Judge Keller "has a penchant for sanctioning Jewish lawyers: me, David Kenner, and Hugh Manes. I take this to be evidence of anti-Semitism." Pet. Ex. 50.

At about the same time, on June 5, 1991, Respondent wrote to Christine Housen of Prentice Hall legal publishers. Pet.Ex. No. 50. Prentice Hall publishes the Judicial Almanac, a collection of profiles of Federal judges and solicits opinions from practicing attorneys for this purpose. The June 5 letter contained what Respondent called:

> the specifics of Judge Keller's atrocious conduct toward attorneys, virtually all of whom fall into the categories of being attorneys who take positions against the government, two of whom are criminal defense attorneys and two of whom are plaintiff's civil rights lawyers, and three of whom happened to be Jewish, backing up the claim that the Judge is, among other things, quite anti-semitic.

As "evidence" of Judge Keller's bias against Jews, Respondent noted that the judge had sanctioned or sought to sanction two other Jewish attorneys in addition to Respondent himself. *Id.* The letter went on to state:

> It is outrageous that the Judge wants his profile redone because he thinks it to be inaccurately harsh in portraying him in a poor light. It is an understatement to characterize the judge as "the worst judge

in the central district." It would be fairer to say that he is ignorant, dishonest, illtempered, and a bully, and probably is one of the worst judges in the United States. If television cameras ever were permitted in his courtroom, the other federal judges in the Country would be so embarrassed by this buffoon that they would run for cover. One might believe that some of the reason for this sub-standard human is the recent acrimonious divorce through which he recently went: but talking to attorneys who knew him years ago indicates that, if anything, he has mellowed. One other comment: his girlfriend is, or was, the newly-appointed U.S. Attorney in Los Angeles, Lourdes Baird, who, like the Judge, is a right wing fanatic.

Respondent admits that he typed the June 5 letter personally. 8/13/93 Tr. at 139. The letter was sent to Christine Housen, though Respondent claims that he did not intend or authorize its transmittal, *see* Pet.Ex. 56–E, a claim which the Panel does not believe. On June 6, a copy of the letter was mailed anonymously to Judge Keller in his chambers. Pet.Ex. 56–D. The Panel finds that Respondent was responsible for mailing this letter.

On June 26, 1991, Yagman & Yagman, P.C., Respondent's law firm, published a half-page advertisement in the *Daily Journal* stating: "This office is gathering evidence concerning sanctions imposed by U.S. Dist. Judge William D. Keller. It would be appreciated if any attorney who has been sanctioned, or threatened with sanctions, by Judge Keller fill out the form below and mail it to us. Thank you." Pet.Ex. 56–F.

One month later, on July 30, 1991, Respondent wrote to Judge Keller for purposes of inquiring whether there were "reasonable grounds to file an action against [him] for, *inter alia,* furnishing to the *Daily Journal* a copy of [his] May 31, 1991 order imposing a sanction on Stephen Yagman." Pet.Ex. 51– G.

At about the same time, in mid-July or early August 1991, Respondent engaged in a

---

1. On appeal, Judge Keller's denial of the disqualification motion was affirmed but the sanctions order was vacated. *Yagman v. Republic Insurance,* 987 F.2d 622 (9th Cir.1993).

conversation with fellow attorney Robert Steinberg in a hallway of the United States Courthouse in Los Angeles. Steinberg was upset by the *Daily Journal* article and had met with Judge Keller to discuss the article. 8/13/93 Tr. at 60–61.

Steinberg asked Respondent about the article. He inquired if Respondent really believed that Judge Keller is anti-Semitic. *Id.* at 62. Respondent stated words to the effect of: "Look, there are certain judges I want to be in front of for my Civil Rights cases who are favorable to my view. And I'd like to recuse out the ones who are extremely unfavorable." *Id.* at 62–63. When Steinberg observed that this practice was unethical, Respondent commented that he [Respondent] could "practice law the way he wants to." *Id.* at 63.

On August 3, 1991, Steinberg wrote to the Petitioner, the Standing Committee on Discipline of the United States District Court for the Central District of California,[2] to report the substance of his conversation with Respondent. Pet.Ex. 55.

On September 12, 1991, Judge Keller wrote a letter formally referring Respondent's conduct to the Standing Committee, pursuant to Local Rule 2.6.3.1. Pet.Ex. 56. A week later, Judge Keller recused himself from the case of *Marshall v. Gates*, CV 91–4860, in which Respondent was attorney for the plaintiff, because of his referral of Respondent for discipline. Apparently pleased with this recusal, Respondent told the *Daily Journal:* "It is remarkable that Keller admits his bias against me, and recuses himself, which is great for my client." Pet.Ex. 59.

## PROCEDURAL HISTORY

On October 28, 1992, the Standing Committee filed a Petition for Issuance of Order to Show Cause why Respondent should not be suspended from the practice of law, or otherwise disciplined under Local Rule 2.6.

Chief Judge Real referred the matter to Chief Circuit Judge J. Clifford Wallace of the Court of Appeals for the assignment of a panel of federal judges from outside the Central District. Circuit Judges Edward C. Reed, Jr., Samuel P. King, and Samuel Conti were selected to hear the matter. On December 17, 1992, after issuing an Order to Show Cause to Respondent, the Ninth Circuit panel referred the matter back to Chief Judge Real for the designation of a panel of three Central District judges in accordance with Central District Local Rule 2.6.4.

On December 24, 1992, the case was randomly assigned to this Panel for all further proceedings. The Panel reissued the Order to Show Cause and set the matter for hearing on August 13, 1993. Evidentiary hearings were conducted on that date and on September 10, 1993. A third day of hearing, set for December 2, 1993, was cancelled at Respondent's request.

## DISCUSSION

The Standing Committee advances two bases for the discipline of Respondent. First, it contends that Respondent's allegations about Judge Keller have degraded and impugned the integrity of the Court in violation of Local Rule 2.5.2. Second, it argues that Respondent's statements were intended to make Judge Keller recuse himself from cases involving the Respondent, thus interfering with the random assignment of judges in violation of Local Rule 2.5.2.

### I. The Legal Framework

The discipline of attorneys for unprofessional conduct is an inherent power of the District Courts. *In re Yagman,* 803 F.2d 1085 (9th Cir.1986); *Standing Committee on Discipline v. Ross,* 735 F.2d 1168, 1170 (9th Cir.), *cert. denied, appeal dismissed,* 469 U.S. 1081, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984).

The standard of professional conduct for attorneys practicing in the Central District is set forth in Local Rules 2.5.1 and 2.5.2. Rule 2.5.1 provides:

---

**2.** This body, hereinafter referred to as the "Standing Committee," consists of twelve attorneys who are members of the bar of this district. The function of the Standing Committee is to investigate charges that attorneys have been guilty of unprofessional conduct and, where appropriate, to initiate and prosecute disciplinary proceedings. *See* Local Rule 2.6.

RULES OF PROFESSIONAL CONDUCT OF THE STATE BAR OF CALIFORNIA—STATE BAR ACT—Each attorney shall become familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable hereto. Those statutes, rules and decisions are hereby adopted as the standards of professional conduct in this Court.

Rule 2.5.2, on the other hand, is independent of California law. It provides: "OTHER STANDARDS—No attorney shall engage in any conduct which degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice therein."

### A. Standard of Proof

This Panel has located no precedent establishing the standard of proof to be applied in attorney discipline proceedings in this district. It is clear that the standard used in California disciplinary proceedings is clear and convincing evidence, *Arden v. State Bar,* 43 Cal.3d 713, 725, 239 Cal.Rptr. 68, 739 P.2d 1236.(1987), yet the Local Rules do not clearly compel adherence to the state standard of proof, *see* Local Rules 2.5.1 and 2.5.2. The Ninth Circuit recently upheld the use of the clear preponderance standard in the context of an attorney charged with making false and malicious statements regarding a federal judge. *United States District Court v. Sandlin,* 12 F.3d 861, 865 (9th Cir.1993). However, in *Sandlin,* the U.S. District Court for the Eastern District of Washington adopted Washington's disciplinary rules, including the clear preponderance standard. *Id.* at 864–65. The Fifth Circuit has adopted the clear and convincing standard for federal disciplinary proceedings. *In re Medrano,* 956 F.2d 101, 102 (5th Cir.1992); *Matter of Thalheim,* 853 F.2d 383, 389 n. 9 (5th Cir. 1988).

Without resolving the question of what minimum standard is required under the Local Rules, the Panel will apply the higher, clear and convincing standard in this proceeding. This standard is appropriate here given the serious nature of the charges against Respondent and the symmetry derived from conformity with California law.

### B. Procedural Rules

■ "The nature of the disciplinary proceeding is neither civil nor criminal, but an investigation into the conduct of the lawyer-respondent." *Standing Committee on Discipline v. Ross,* 735 F.2d 1168, 1170 (9th Cir. 1984); accord *Rosenthal v. Justices of the Supreme Court of California,* 910 F.2d 561, 564 (9th Cir.1990). There is no uniform procedure for disciplinary proceedings in the federal system and each district may define the rules to be followed. *Ross,* 735 F.2d at 1170. "At a minimum, however, an attorney subject to discipline is entitled to procedural due process including notice and an opportunity to be heard." *Id.; Rosenthal,* 910 F.2d at 564.

The parties have disputed whether the Federal Rules of Evidence must be followed in this proceeding. The Panel finds that strict adherence to the Federal Rules of Evidence is not required. "The proceedings for such discipline need not comply with all the formalities of process or other trial procedure." *In re Claiborne,* 119 F.2d 647, 650 (1st Cir.1941). California case law holds that "[t]here is no legislative requirement ... that the rules of evidence in the Code of Civil Procedure be applied in disbarment proceedings, although they are frequently invoked to insure a fair hearing.... There is no reason for invoking them, however, if they are not necessary to serve that purpose." *Werner v. State Bar,* 24 Cal.2d 611, 615, 150 P.2d 892 (1944).

■ The Federal Rules of Evidence do not apply to these proceedings by their own terms. Rule 1101(b) states that the Rules apply to civil actions, criminal cases, contempt proceedings, and bankruptcy proceedings. Since a disciplinary proceeding is "neither civil nor criminal," *Ross,* 735 F.2d at 1170, it is not encompassed by Rule 1101(b).

Nor do the Local Rules of this district require use of the Federal Rules of Evidence. Local Rule 2.6.4 does state that, unless oth-

erwise provided, the Federal Rules of Civil Procedure will govern, but the Local Rules are silent as to what evidentiary rules should apply during the adjudication of a disciplinary proceeding.

## II. Impugning the Integrity of the Court

Courts have long held that while a lawyer may, in a proper tone and through the appropriate channels, attack the integrity or competence of a court or judge, he may not, by intemperate and unfounded charges, create disrespect or contempt for courts or their decisions, and if he does so he may properly be disciplined. *See* W.E. Shipley, Annotation, *Attorney's Criticism of Judicial Acts as Ground of Disciplinary Action*, 12 A.L.R.3d 1408 (1993); *see, e.g., Ramirez v. State Bar of California*, 28 Cal.3d 402, 169 Cal.Rptr. 206, 619 P.2d 399 (1980); *Peters v. State Bar of California*, 219 Cal. 218, 223, 26 P.2d 19 (1933); *In re Philbrook*, 105 Cal. 471, 38 P. 884 (1895).

The justification for discipline in this context is not the sensibility of the criticized judge but the concern that verbal attacks tend to discredit the courts and weaken the effectiveness of the judicial process. In this vein, the Supreme Court has observed that the "judiciary as well as the public is dependent upon professionally ethical conduct of attorneys and thus has a significant interest in assuring and maintaining high standards of conduct of attorneys engaged in practice." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n.*, 457 U.S. 423, 434, 102 S.Ct. 2515, 2522, 73 L.Ed.2d 116 (1982).

In this district, the duty of attorneys with respect to the judiciary is expressed in Local Rule 2.5.2 which provides that "[n]o attorney shall engage in any conduct which degrades or impugns the integrity of the Court. . . ."

### A. First Amendment Concerns

The "disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, ——, 111 S.Ct.

2720, 2734, 115 L.Ed.2d 888 (1991) (Kennedy, J., plurality opinion). However, since lawyers are officers of the courts, "they may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech." *Id.* at ——, 111 S.Ct. at 2748 (O'Connor, J., concurring). Thus, a majority of the Supreme Court in *Gentile* agreed that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that applied to members of the press.

■ Prior to examining whether Respondent in fact impugned the integrity of the court, the Panel must reach the issue of the propriety of sanctions under the First Amendment. Curiously, while the Standing Committee in its final brief discusses First Amendment principles in detail, the Respondent's treatment of the issue is cursory.

■ Local Rule 2.5.2, on its face, raises overbreadth concerns.[3] A statute is overbroad if, in addition to proscribing activities which constitutionally may be forbidden, it also sweeps within its coverage protected activities. *See, e.g., Board of Airport Commissioners of Los Angeles v. Jews for Jesus*, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). Under the broad terms of Rule 2.5.2, truthful statements that impugn the integrity of a judge are sanctionable. Thus, for example, an attorney who accurately reveals a judge's illegal act could be sanctioned.

Respondent may nonetheless be sanctioned for impugning the integrity of the court if Local Rule 2.5.2 is given a saving construction. Such a correction is appropriate if there is a "core of easily identifiable and constitutionally proscribable conduct that the statute forbids." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 965–66, 104 S.Ct. 2839, 2851–52, 81 L.Ed.2d 786 (1984).

The Panel interprets Local Rule 2.5.2 in accord with the standard for defamation actions. Under *New York Times v. Sullivan*,

---

**3.** *But see Matter of Swan*, 833 F.Supp. 794 (C.D.Cal.1993) (sanctioning attorney under Rule 2.5.2 for sexist statement in letter to another attorney; overbreadth not discussed); *In the*

*Matter of Holtzman*, 78 N.Y.2d 184, 190–91, 573 N.Y.S.2d 39, 577 N.E.2d 30 (1991) ("Broad standards governing professional conduct are permissible and indeed are often necessary.").

376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a public official such as a federal judge may sue for defamation where the speaker acts with "actual malice," that is, with knowledge that his statement was false or with reckless disregard for its truth or falsity.

That Local Rule 2.5.2 is a disciplinary rule, as opposed to a private right of action, is immaterial. The American Bar Association has incorporated the *New York Times* standard in Model Rule of Professional Conduct 8.2, which provides:

> (a) a lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

This construction of Local Rule 2.5.2 is also consistent with California law.[4] Under the State Bar Act, attorneys are required "to maintain the respect due to the courts of justice and judicial officers." Cal.Bus. & Prof.Code § 6068(b).[5] In *Ramirez v. State Bar of California,* 28 Cal.3d 402, 169 Cal. Rptr. 206, 619 P.2d 399 (1980), the California Supreme Court, under several statutory provisions including § 6068(b), sanctioned an attorney who maligned justices of the California Court of Appeal. The Supreme Court rejected the attorney's First Amendment argument, concluding that his "several demeaning statements have been made with reckless disregard of the truth." 28 Cal.3d at 411, 169 Cal.Rptr. 206, 619 P.2d 399.

A modified version of the *New York Times* standard applies in the context of attorney discipline. In the recent case of *United States District Court v. Sandlin,* 12 F.3d 861 (9th Cir.1993), the Ninth Circuit considered a disciplinary sanction under Washington Rule of Professional Conduct 8.2, which is identical to ABA Model Rule 8.2. The Court of Appeals stated:

> The Supreme Courts of Missouri and Minnesota have determined that, in light of

the compelling interests served by RPC 8.2(a), the standard to be applied is not the subjective one of *New York Times,* but is objective. *[Matter of] Westfall,* 808 S.W.2d [829] at 837 [1991]; *In re Disciplinary Action Against Graham,* 453 N.W.2d 313, 322 (Minn.), *cert. denied,* 498 U.S. 820 [111 S.Ct. 67, 112 L.Ed.2d 41] (1990). We agree. While the language of WSRPC 8.2(a) is consistent with the constitutional limitations placed on defamation actions by *New York Times,* "because of the interest in protecting the public, the administration of justice, and the profession, a purely subjective standard is inappropriate." *Westfall, id.* at 837. Thus, we determine what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances.

*Sandlin,* 12 F.3d at 867.

Under this objective standard, a statement is reckless if made without any reasonable basis in fact. *Id.* Ignorance is not bliss; an attorney has an obligation to conduct a factual inquiry prior to speaking. *See id.* (without first deposing court reporter, attorney told FBI that judge ordered reporter to alter transcript); *Westfall,* 808 S.W.2d at 838 (without investigation, attorney made publicly televised statement accusing judge of purposefully dishonest conduct); *In the Matter of Elizabeth Holtzman,* 78 N.Y.2d 184, 573 N.Y.S.2d 39, 577 N.E.2d 30 (1991) (prior to obtaining trial minutes and without making any effort to interview witnesses, district attorney accused judge of requiring witness to demonstrate the position she was in when sexually assaulted), *cert. denied,* —— U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991).

### B. Application of the Sandlin Standard

■ In his statement to the *Daily Journal* and in his June 5 letter to Prentice Hall, Respondent accused Judge Keller of being "drunk on the bench," of being anti-Semitic, of having a "penchant for sanctioning Jewish lawyers," of being "ignorant, dishonest, ill-

---

4. As noted earlier, Local Rule 2.5.2 is an independent standard of the Central District and the Panel is not bound by California law.

5. This very language is contained in the oath taken by every attorney admitted to the bar of this district.

tempered, and a bully," and of being a "substandard human." There is clear and convincing evidence that Respondent made these statements and that they impugn the integrity of the Court.

The charges, in particular the accusations of dishonesty, drunkenness and anti-Semitism, cannot be dismissed as statements of opinion that are protected by the First Amendment. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir.1990).[6] They contain provably false factual connotations and are not rhetorical hyperbole. To say that a judge has a penchant for sanctioning Jewish attorneys is a simple and direct accusation of bias. It is provably false since it is possible to determine empirically whether the judge imposes sanctions in a disproportionate fashion. Similarly, the charges of drunkenness and dishonesty plainly imply past improprieties.

Respondent contends that the letter to Prentice Hall cannot form the basis for discipline because it was private and transmitted to a nationally recognized publication that evaluates judges. Respondent's Post-Hearing Brief at 16–17. The characterization of the letter as "private" is factually untrue since it was transmitted to Judge Keller and since it was aimed at influencing Prentice Hall's written evaluation of the judge. More importantly, Respondent cites no authority that supports the blanket privilege he advances. Pursuant to *Milkovich*, if the letter contained provably false factual connotations, they are actionable.[7]

Thus, unless Respondent had an objectively reasonable basis for his accusations against Judge Keller, he is subject to discipline for those statements, including those in the letter to Prentice Hall.

Respondent focuses his defense on the accusation of anti-Semitism. The primary basis for his allegation is anecdotal. Respondent testified that he knows several Jewish attorneys who have been disciplined by Judge Keller. It is beyond question that a reasonable attorney would have conducted a more thorough inquiry before making such a serious charge against a judge. There are hundreds if not thousands of local attorneys who have practiced before Judge Keller. Anecdotal evidence regarding the experiences of several is insufficient given the gravity of the charge.

In addition, Respondent states that his opinion is founded on Judge Keller's use of the term "pestiferous" in reference to Respondent.[8] Respondent reasons that one of the meanings of "pestiferous" is "diseased," and the Nazis applied the term "diseased" to Jews. This argument is as ludicrous as it appears. The word pestiferous has several meanings, including "pernicious, troublesome, and annoying," which contain no anti-Semitic connotations whatsoever.[9] The Panel finds no evidence that Judge Keller is in fact anti-Semitic or that Respondent had a reasonable basis for making such accusations.

Respondent has made no effort to explain his accusations that Judge Keller is dishonest or "drunk on the bench." In the absence of supporting evidence, the Panel presumes that these charges are false and that Respondent lacked an objectively reasonable basis for expressing them.

---

**6.** In *Milkovich*, the Supreme Court refused to create a special privilege for statements of opinion in the defamation context on the ground that existing constitutional doctrine adequately secured First Amendment interests. 497 U.S. at 19, 110 S.Ct. at 2706.

**7.** The only case cited by Respondent, *Botos v. Los Angeles County Bar Association*, 151 Cal.App.3d 1083, 199 Cal.Rptr. 236 (1984), does not support his position. In *Botos*, the court held that the Bar Association could not be liable for defamation as the result of evaluating a candidate for judicial office as "not qualified." The Court emphasized that the evaluation was a statement of opinion, not fact. *Id.* 199 Cal.Rptr. at 240. Here, as noted above, Respondent did not merely offer an opinion.

**8.** Judge Keller used this term in his May 31, 1991 order referring Respondent to the State Bar for discipline.

**9.** Respondent's attempt to rationalize his groundless accusation by relying on the term "pestiferous" appears even more absurd when one considers that Respondent himself, in referring to Judge Keller, used the term "sub-standard human."

In sum, the Panel finds that Respondent impugned the integrity of the court and thereby violated Local Rule 2.5.2.

### III. Judge Shopping

■ General Order No. 224, promulgated pursuant to Local Rule 4.1, governs the assignment of cases within this district. In providing for the random assignment of cases, "the General Order evinces a policy of objectivity and fairness in the distribution of all matters." *U.S. v. Flynt,* 756 F.2d 1352, 1355 n. 2 (9th Cir.1985). Attempts to interfere with the random assignment of judges, for whatever reason, threaten the integrity of this Court, and subject the offending attorney to discipline under Local Rule 2.5.2.

By clear and convincing evidence, the Panel finds that Respondent believed Judge Keller to be "unfavorable" for his cases and that Respondent criticized Judge Keller in an effort to force him to recuse himself from future proceedings involving Respondent.

### A. The Admission to Steinberg

The strongest proof of Respondent's scheme is his own admission to attorney Robert Steinberg during their conversation at the Courthouse. Both Respondent and Steinberg testified that they discussed which judges are most favorable to plaintiffs in civil rights cases. According to Steinberg, Respondent stated that there are certain judges he preferred for his cases and that he would like to obtain the recusal of the judges who are extremely unfavorable. When Steinberg protested this strategy, Respondent stated that he would practice law the way he wanted. Respondent's desire to judge shop is unmistakably evident in this conversation.

Respondent contends that it was Steinberg, not he, who stated that there were some judges who were more favorable to plaintiffs in civil rights cases, and that Respondent merely agreed with Steinberg. 8/13/93 Tr. 128–129.

Despite Respondent's challenges to Steinberg's credibility, the Panel finds his testimony credible and that his version of the conversation is the more plausible. As an initial matter, the Panel finds no motive for Steinberg to lie. There is no evidence of animosity between Respondent and Steinberg. The two attorneys are not competitors: Steinberg practices criminal defense while Respondent dedicates himself to civil rights actions. Steinberg's version of his encounter with Respondent also is supported by independent evidence of Respondent's intent.

### B. Other Evidence that Respondent Was Judge Shopping

First, Respondent's conduct in the days after May 31, 1991 is probative of judge shopping. By his statements to the *Daily Journal* and his half-page advertisement in that publication, Respondent ensured that both Judge Keller and the general public learned of his accusations. Respondent wrote the inflammatory letter of June 5, 1991 to Prentice Hall and sent a copy to Judge Keller.[10] In a subsequent letter written directly to Judge Keller, Respondent threatened the judge with a civil lawsuit unless he explained his conduct. Finally, when Judge Keller recused himself in the case of *Marshall v. Gates,* Yagman candidly enthused that the result was "great" for his client. This series of acts by Respondent evinces a campaign to antagonize Judge Keller and to pressure his recusal.

What Respondent did not do is also significant. A statutory remedy exists for those who believe that a judicial officer has engaged in conduct prejudicial to the administration of justice or that the officer is mentally or physically unfit for duty. *See* 28 U.S.C. § 372(c). While there is no requirement that criticism of judicial officers be channeled through § 372(c), if Respondent had a genuine belief that Judge Keller was not qualified to discharge his obligations, he could have filed a complaint under this section.

Second, Respondent's conduct before May 31, 1991 establishes a prior history of judge shopping.

---

**10.** The only reasonable explanation for how the letter reached Judge Keller is that someone in Respondent's office mailed it and it is highly unlikely that the mailing would occur by accident. That Respondent denies sending the letter is self-serving and unpersuasive.

On September 14, 1981, Respondent simultaneously filed five substantially similar complaints in this district, and dismissed four of them within 73 minutes after they had been assigned to various judges. The Standing Committee filed a petition for an order to show cause why Respondent should not be disciplined for his conduct. Pet.Ex. 1. That disciplinary action, *Standing Committee v. Yagman*, CV 82–5412 MML, was resolved by a stipulated settlement. Pet.Ex. 13. Respondent admitted that he had committed acts in violation of Local Rule 2. The stipulation provided that Respondent would be suspended from practice for one month, would pay a $500 fine and would perform twenty-five hours of pro bono service. The Ninth Circuit affirmed the settlement. Pet. Ex. 20.

Following these events, in late 1985, Respondent appeared before Judge Harry L. Hupp in a civil rights case entitled *Heath v. Cast*, CV 84–1397 HLH. Respondent represented plaintiff in that matter and Thomas Feeley was defense counsel. After a three-week trial, the jury returned a defense verdict. Respondent, on behalf of his client, immediately filed a new action against the defendants and their lawyers alleging that in the course of defending *Heath v. Cast* they had deprived the plaintiff of his civil rights and engaged in racketeering, mail fraud and obstruction of justice. In addition, Respondent alleged that Judge Hupp "conspired with the defendants and with their legal counsel to obstruct justice in the federal courts...."[11] The suit against Judge Hupp *et al.* was dismissed upon motion and the dismissal was affirmed on appeal. Judge Hupp recused himself from all post-trial proceedings in *Heath v. Cast* and since then has declined to hear any case involving Respondent. Hupp Declaration, September 20, 1993, at 2.

Whatever Respondent's motivation for making frivolous allegations against Judge Hupp, the incident showed Respondent the power he could wield by charging judges with impropriety in their handling of cases. Respondent found that he could pressure judges to recuse themselves from his cases.[12]

Respondent was also successful in forcing the recusal of Chief Judge Real in the case of *Brown v. Baden*, CV 84–5839–R. In this action, Chief Judge Real granted a directed verdict in favor of the defendants and imposed sanctions against Respondent and his professional corporation.

On appeal, Respondent sought reversal of the directed verdict and sanctions, alleging bias on the part of Chief Judge Real. *In re Yagman*, 796 F.2d 1165 (9th Cir.1986). Respondent claimed that the judge denied the plaintiffs a fair trial due to his "patent hostility" and his "one-sided and arbitrary" conduct. Respondent termed the trial a "judicial mugging" and "tyranny in its worst form," and charged that the judge "exhibited a strong personal bias and prejudice against Stephen Yagman of unmistakable longstanding [sic], and a partiality for the defendants." *Id.* at 1178. Respondent apparently also theorized to the Ninth Circuit that Chief Judge Real had deliberately taken the case from another judge in order to prevent Respondent from testifying against the judicial nomination of one of Chief Judge Real's colleagues. *Id.* at 1179–80.

11. Respondent put the allegations against Judge Hupp in a separate averment which he labeled with the word "sealed." However, Respondent never sought a Court order sealing the averment, and so it is a publicly available document.

12. Respondent objects to the consideration of this evidence because the issue was raised by the Panel, not by the Standing Committee, and because the evidence was so remote in time that its consideration would violate Federal Rules of Evidence 403 and 404(b).

The Panel observes that both parties were asked to discuss the Judge Hupp issue, and were given ample time to investigate and brief the issue. Petitioner submitted a brief discussing the incident, along with declarations from Judge Hupp and the defense attorney in *Heath*. Respondent's request for a hearing to cross-examine these declarants was granted, but the hearing was cancelled at Respondent's request.

With respect to the evidentiary objection, the Panel reiterates that the usual evidentiary rules are not enforced as strictly in a disciplinary hearing, and that even if they were, the Panel finds this evidence admissible under both rules.

Finally, the Panel notes that there is ample evidence apart from Judge Hupp's recusal to support the finding of judge shopping.

Respondent also launched a public attack on Chief Judge Real. In a prepared statement issued to the press, Respondent stated that the judge "consistently has been held in the lowest regard by virtually the entire community since he took the bench," and accused him of suffering from "mental disorders." Pet.Ex. 73.

In its decision, the Ninth Circuit made it clear that there was "no support in the record for the claim that Judge Real was personally biased or prejudiced against Yagman. The invidious motive articulated by Yagman is entirely speculative." *Id.* at 1181. Despite this finding, however, the Court of Appeals disqualified Chief Judge Real from further proceedings. The court explained:

> We do not appreciate nor condone the attorney bickering and misconduct which has pervaded the action and which spawned the district court's ire. Nevertheless, the massive sanction award *and the numerous allegations of bias and overreaching* have combined with this poor lawyering to reach an entirely unfortunate end result: the fragile appearance of justice has taken a beating.

*Id.* at 1188 (emphasis added).

Once again, Respondent found that allegations of bias could force the removal an unfavorable judge, as long as the allegations were strong enough to "batter" the appearance of justice.

In sum, the testimony of Robert Steinberg combined with Respondent's actions after May 31, 1991 and before, convincingly demonstrate that Respondent sought to force the recusal of Judge Keller in future cases involving Respondent. It is no answer to argue, as Respondent does, that these personal attacks are not grounds for recusal. That argument goes to whether Respondent was likely to succeed,[13] not to Respondent's intent in making the allegations. Moreover, the Panel notes that given the disqualification of Chief Judge Real in *Brown v. Baden*, Respondent could believe that his allegations would lead to removal of unfavorable judges, regardless of whether they chose to recuse themselves.

## C. First Amendment Issues

■ The First Amendment is implicated in the judge shopping charge because the means used by Respondent involved verbal expression. However, because the prohibition against judge shopping targets conduct, not expression, the First Amendment is not offended by sanctioning Respondent.

The "authorities make it clear ... that 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Cox v. State of Louisiana*, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949)).

*State v. Eisenberg*, 48 Wis.2d 364, 180 N.W.2d 529 (1970), *cert. denied*, 402 U.S. 987, 91 S.Ct. 1669, 29 L.Ed.2d 153 (1971), is remarkably similar to the case at bar. In that case, the Wisconsin Supreme Court suspended two lawyers who harassed a county judge by: (1) publicly circulating statements that the judge was guilty of criminal conduct for which a warrant would issue unless the judge resigned; (2) taking out newspaper advertisements soliciting complaints against the judge; (3) pressuring the judge to appoint them to an advisory committee concerning the administration of the court; and (4) forcing the judge to publicly read a press release announcing their appointment. *Id.* 180 N.W.2d at 536. The Court rejected the lawyers' First Amendment argument, noting: "Although speech activity is involved, it is intermingled with a course of conduct which is alleged to be unprofessional. The fact that speech is intermingled with conduct does not endow the conduct with constitutional protection where the state can properly regulate the conduct as a whole." *Id.* at 537.

---

**13.** Note: Judge Keller did recuse himself from a later case involving Respondent, *Marshall v. Gates.*

## CONCLUSION

It is a rare and unfortunate day when the judges of this district must sanction an attorney for conduct involving criticism of the bench. Robust debate regarding judicial performance is essential to a vital judiciary. If an attorney, after reasonable inquiry, has concerns about a judicial officer's fitness for service, he or she may and should express them publicly. Conversely, baseless factual allegations contribute nothing to judicial accountability and undermine public trust in the courts. In this case, Respondent accused Judge Keller of unfitness, falsely and without foundation, and did so with the specific aim of interfering with the random assignment of judges. Thus, the panel finds that Respondent violated Local Rule 2.5.2 and that some measure of discipline is required.

## ORDER

For the reasons set forth above, IT IS HEREBY ORDERED that the parties shall file written briefs with regard to what sanction should be levied, including the question of the criteria that should be considered in determining the sanction. The Standing Committee shall file its brief within fourteen days of the date that this order is served.[14] The Respondent shall file his response within fourteen days after receipt of the Standing Committee's brief.

IT IS FURTHER ORDERED that either party may request an oral hearing on the question of the appropriate sanction by means of an ex parte application to the Panel.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this order on all counsel of record by facsimile and by United States Mail.

---

14. The Panel recognizes that the Standing Committee filed a brief on the sanctions question on September 9, 1993. The Standing Committee shall submit a new brief in accord with the factual findings in this order.