**Geoffrey N. FIEGER, Plaintiff,**

v.

**Philip J. THOMAS, Grievance Administrator and Michigan Attorney Grievance Commission, jointly and severally, Defendants.**

No. 94–CV–74375–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 2, 1994.

Michael Alan Schwartz, Southfield, MI, for plaintiff.

Jane Shallal, Detroit, MI, for defendants.

BORMAN, District Judge.

Plaintiff has filed a Motion asking that the Court preliminarily enjoin Grievance Administrator Philip J. Thomas, and the Michigan Attorney Grievance Commission (AGC), from prosecuting a three-count complaint (ATTACHMENT 1), filed against him on October 12, 1994. This complaint is to be heard in the near future by the Michigan Attorney Discipline Board (ADB) (ADB Case No. 94–186–GA). Plaintiff further seeks an order staying the ADB proceedings pending a final hearing before this Court. Plaintiff alleges federal jurisdiction under 28 U.S.C. § 1331 and 1343(a), and further alleges that AGC prosecution would violate the Constitution and laws of the United States, to wit, the First, Fifth, Sixth and Fourteenth Amendments, and 42 U.S.C. § 1983. Defendant AGC has filed a Response to Application for Preliminary Injunction and Motion for Summary Judgment.

This Court heard argument on Plaintiff's Application for Preliminary Injunction on November 23, and November 28, 1994.

The United States Court of Appeals for the Sixth Circuit has held:

In determining whether a preliminary injunction should issue, a court must consider the following four factors:

1. whether the movant is likely to prevail on the merits;

2. whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3. whether a preliminary injunction would cause substantial harm to others; and

4. whether a preliminary injunction would be in the public interest.

*G & V Lounge v. Michigan Liquor Control Commission,* 23 F.3d 1071, 1076 (6th Cir. 1994).

This Court accepts Federal jurisdiction, but rejects Plaintiff's motion for a preliminary injunction. This Court concludes:

1. there is a question whether Plaintiff is likely to prevail on the merits;

2. plaintiff will not suffer an irreparable injury by the Court not granting a preliminary injunction. Plaintiff continues to be a full member of the State Bar of Michigan;

3. granting of a preliminary injunction would effectively disrupt a significant portion of the disciplinary work of the AGC; and

4. a preliminary injunction at the present time, based on the facts and issues before the Court would not be in the public interest.

The Court does, however, continue its jurisdiction over the case pending further state proceedings, and, if necessary, will revisit the question of enjoining state proceedings/discipline against Plaintiff if this Court subsequently concludes that his federal constitu-

tional rights have been violated. The Court denies Defendants' Motion for Summary Judgment.

*ABSTENTION ISSUE*

This Court's initial refusal to issue a preliminary injunction does not signify this Court's rejection of the case, nor does it signify this Court's granting of Defendant's motion for summary judgment. This Court will retain jurisdiction over this case, because the Michigan disciplinary procedure, does not guarantee Plaintiff a *right* to judicial review of ADB disciplinary sanctions.

There is no justification *at this time* for a preliminary injunction. There would be, however, a significant violation of Plaintiff's constitutional right to due process and a justification for federal court intervention if the ADB, an entity established by the Michigan Supreme Court, privately funded by attorney dues, disciplines Plaintiff, and the State Supreme Court refuses Plaintiff's petition for leave to review any sanction imposed.

Further, there could be a significant violation of Plaintiff's first amendment rights if the ADB were to discipline him for robust free speech, or based upon Rules that are so vague, indefinite and overbroad as to violate the federal Constitution. In these situations, this Court would stand ready to revisit the case and hear arguments and rule on these vital Federal Constitutional issues.

The Supreme Court has applied *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), abstention to disciplinary proceedings brought by state bar associations against attorneys in *Middlesex County Ethics Committee v. Garden State Bar Assn.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).[1] The Michigan procedure for attorney discipline, unlike the New Jersey proceeding in *Middlesex*, does not guarantee Plaintiff an opportunity to have his constitutional claims determined in state judicial proceedings. In Michigan, Petitioners can petition the Supreme Court for leave to appeal an ADB order of discipline. In *Mid-*

*dlesex*, the New Jersey Supreme Court reviewed all disciplinary actions, including "constitutional challenges even when [only] a private reprimand is made." *Middlesex*, at 436 n. 15, 102 S.Ct. at 2523, n. 15.

In *Parker v. Kentucky Board of Dentistry*, 818 F.2d 504 (6th Cir.1987), the United States Court of Appeals for the Sixth Circuit set forth a three-part test as to the applicability of *Younger* abstention. All three factors must be found to support abstention.

First; are proceedings pending? In the instant case proceedings are pending; the (AGC) has filed formal complaint # 94–186 GA against Plaintiff Geoffrey Fieger.

Second; do the state proceedings involve an important state interest? As the Supreme Court noted in *Middlesex County Ethics Committee, supra*, the state:

> has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses. The judiciary as well as the public is dependant upon professionally ethical conduct of attorneys.... *Id.* at 434, 102 S.Ct. at 2522.

Third; "the Court must determine whether the state proceedings will afford the plaintiff an adequate opportunity to raise his constitutional claims" (*Parker*, at 508), "whether the 'constitutional claims may be raised in state court judicial review of the administrative proceeding,'" *Id.*, (quoting *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 629, 106 S.Ct. 2718, 2724, 91 L.Ed.2d 512 (1986)). In the instant case there is no such guarantee. Plaintiff will be "tried" first by a three-attorney ADB panel with the *right* of appeal only to the full ten person ADB, composed of eight attorneys and two lay members.

The Sixth Circuit specifically held in *In re Grand Jury 89–4–72*, 932 F.2d 481, 487 (6th Cir.1991), that Michigan bar administrative hearings "before a panel of private attorneys and laypersons, funded by a private

---

1. The Supreme Court has also stated:
   United States District Courts, therefore have subject-matter jurisdiction over general challenges to state bar rules, promulgated by state courts in nonjudicial proceedings, which do not require review of a final state-court judgment in a particular case. *District of Columbia Court of Appeals v. Feldman* [460 U.S. 462, 486–88], 103 S.Ct. 1303, 1317 [75 L.Ed.2d 206] (1983).

organization, with limited discretionary review to the Michigan Supreme Court, are not judicial proceedings within the meaning of Rule 6(3)(c)(i) of the Federal Rules of Criminal Procedure." This Court finds that the Michigan ADB procedures facing Plaintiff do not constitute adequate judicial proceedings to guarantee his right to procedural due process because there is no *right* to state court judicial review of the administrative proceeding at which Plaintiff can raise his constitutional claims. MCR 9.122(A), which offers merely a right to "apply for leave to appeal to the Supreme Court," is not sufficient.

Accordingly, this Court will not abstain, in light of the Sixth Circuit's language in *Parker*:

> [F]or a federal court to abstain from realizing the merits of a case under *Younger*, it must be assured that there exists a *definite* opportunity for the federal plaintiff to raise his constitutional claims on direct state judicial review of the state administrative proceedings. Since that is clearly not the case here, abstention is inappropriate and we may reach the merits of this case. *Id.* at 509 (emphasis added).

### PROCEDURAL DUE PROCESS ISSUE

If the Michigan Supreme Court does not provide judicial review of Plaintiff's constitutional claims, should he be disciplined by the ADB, he is deprived of his federal constitutional right to procedural due process. The ADB panel and full board are at best, quasi judicial bodies. The Michigan Supreme Court stated in *Wikman v. Novi*, 413 Mich. 617, 646–47, 322 N.W.2d 103 (1982), that "[g]enerally speaking, an agency exercising quasi-judicial power does not undertake the determination of constitutional questions or possess the power to hold statutes unconstitutional." While this quote contains

the savings clause "generally speaking," and while counsel for the AGC in open court stated that Plaintiff can raise his constitutional claims before the ADB, this Court concludes that such does not suffice under the right to procedural due process—a guaranteed right to have those constitutional claims adjudged in court. *Middlesex County Ethics Committee v. Garden State Bar Assn., supra; Parker v. Kentucky Board of Dentistry, supra.*

Accordingly, this Court will remain available to hear Plaintiff's federal constitutional claims if Petitioner is disciplined by the ADB, and if the Michigan Supreme Court refuses to provide judicial review.

### FIRST AMENDMENT ISSUE

All three counts of the AGC complaint against Plaintiff are based upon his public comments—public speech. All three counts charged that the Plaintiff's statements "were false, and were known by Respondent to be false at the time they were made, or were made with reckless disregard as to their truth or falsity." (Complaint; Paragraphs 11, 20, 25)

In each of the three counts, this aforestated language was followed by the following language:

> Respondent's conduct . . . constitutes professional misconduct, in violation of MCR 9.104(1)–(4); and the Michigan Rules of Professional Conduct, to wit: 8.2(a) and 8.4(a)–(c). (Complaint; Paragraphs 12, 21, 26).

The first count involved comments made by Plaintiff relating to a matter where he had been retained by the family of a prisoner who died as a result of what Plaintiff had described as a murder, and what the county prosecutor had described as a suicide.[2]

---

**2.** The relevant paragraph of the AGC complaint stated:

> 10. Respondent violated his duties and responsibilities in that in February 1993, during his representation of the Davidson family, he publicly accused the Ionia County Prosecutor of failing to investigate and covering up murder, as follows:
>
> a) He stated, "As far as I'm concerned the prosecutor is engaged in a cover-up.";

> b) He stated, "The prosecutor has done nothing in this investigation. He's covering up a murder.";
>
> c) He stated, "This is a cover-up. It's an old style vigilante lynching. I think the suggestion of suicide is preposterous. He [Davidson] was murdered.";
>
> d) He stated, "I believe the State of Michigan is participating in a conspiracy to cover-up murder."; and,

The second count involved comments made by Plaintiff relating to a civil case in which he represented a plaintiff in a Wayne County Circuit Court civil action against a defendant represented by Attorney Constance Cumbey. A few weeks after the Circuit Judge dismissed the Plaintiff's case, the Judge's daughter commenced employment with Attorney Cumbey.[3]

The third count involved comments made by Plaintiff relating to a case before the Michigan Court of Appeals which ruled (2–1), on a significant issue against Plaintiff's client.[4]

> e) He stated, "Michigan is now a state where high government officials call suicide a homicide—if you get my drift—and call homicide a suicide."

**3.** The relevant paragraph of the AGC complaint stated:

> 19. Respondent violated his duties and responsibilities in that in December 1993 and January 1994, he publicly stated that Judge Stempien had conspired with Ms. Cumbey to dismiss the *Gale* case in exchange for Ms. Cumbey providing employment for Judge Stempien's daughter. With respect to the alleged conspiracy, Respondent stated, "This is an act of monumental judicial corruption that has got to be investigated." Respondent also stated, "His [Judge Stempien's] acts indicate as corrupt a judicial temperament as one could possibly imagine."

**4.** The relevant paragraph of the AGC complaint stated:

> 24. Respondent violated his duties and responsibilities in that on May 11 and 12, 1994, he publicly attacked the qualifications and integrity of the judges who participated in the Court of Appeals' decision involving his client, as well as justices of the Michigan Supreme Court, as follows:
> a) In response to a comment by the media that Respondent, in reaction to the Court of Appeals' decision, had reportedly publicly called everybody in the Michigan judiciary stupid, Respondent stated, "No, not everybody, just two people, amazingly stupid, one of whom is the attorney—Governor Engler's attorney, her husband (Clifford Taylor) was one of the judges.";
> b) With respect to Judge Taylor, Respondent also stated, "We knew exactly what he was going to do from the moment he was sitting on this case. He lost for the attorney generalship, Governor Engler appointed him to the Michigan Court of Appeals as a political plum, and we knew what he was going to do from the very beginning.";

Thus, all three counts of the AGC complaint against Plaintiff are based upon his public speech. None of Plaintiff's statements were made in court, or during the pendency of a trial. The statement critical of a prosecutor was not made during the pendency of any legal proceeding.

All three statements related to cases or matters in which the Plaintiff was representing a party in interest, or a potential party in interest. As to count one, Plaintiff had been retained by the family of the deceased prisoner. As to the case involved in count two,

> c) He further stated, referring to judges sitting on the Court of Appeals panel which decided the case, "[W]hat's so shameful in this state, where we got judges appointed to the bench who have never practiced law, they have no idea of what they are doing.";
> d) Respondent also stated, with respect to these judges, "That's how—I mean our judiciary is laughed at in the rest of the country. It's not cited in any other state court or federal court decisions. We have no Cardosos [sic], we have no Learned Hands, we have no Brandices [sic], we got nobody. We got political hacks, we got Robert Griffin, a failed Senator who retires and gets—a former Lieutenant Governor. We got all these people and we got nobody who knows the law sitting in the higher court judiciary.";
> e) Respondent stated, "Cliff Taylor and Fitzgerald, you know I don't think they ever practiced law, I really don't. I think they got a law degree and they said, well it will be easy to get a—they get paid $120,000 a year, you know, and people vote on them, you know, when they come up for election, and the reason they keep getting elected because they're the only elected officials in the state who get to have an incumbent designation, so when you go into the voting booth and it says 'Cliff Taylor,' it doesn't say failed Republican nominee for attorney general who never had a job in his life, who's wife is Governor Engler's lawyer, who got appointed when he lost, it says 'Cliff Taylor incumbent judge of the Court of Appeals', and they vote for him even they don't know him. The guy could be Adolph Hitler, as long as he changes his name and it says 'incumbent judge' he gets elected."; and,
> f) Respondent stated, concerning Judge Taylor, "[T]his guy has a political agenda ... I knew in advance what he was going to do ... We know his wife is Governor Engler's Chief Counsel. We know his wife advise (sic) him on the law. We know—we knew—what he was going to do in advance, and guess what, he went right ahead and did it. Now you can know somebody's political agenda affects their judicial thinking so much that you can predict in advance exactly what he's going to do ...

Counsel for Plaintiff indicated at the Federal Court hearing on November 23, 1994, that this dismissal is on appeal; thus the case is still "alive." As to the case involved in count three, Counsel for Plaintiff indicated at the Federal Court hearing on November 23, 1994, that leave to appeal is being sought before the Michigan Supreme Court.

The most recent United States Supreme Court decision on attorney First Amendment rights, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991), noted, in that portion of the majority opinion written by Chief Justice Rehnquist,[5] that an attorney's right to free speech is subject to certain restrictions outside the courtroom, even though there are no ongoing judicial proceedings:

> Even outside the courtroom, a majority of the Court, in two separate opinions in the case of *In re Sawyer*, [360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473] [ (1959) ], observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. Justice Stewart, who provided the fifth vote for reversal of the sanction, said in his separate opinion that he could not join any possible "intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from evenhanded discipline for proven unethical conduct." He said that "obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *Id.* at 1071, 111 S.Ct. at 2743. (citations omitted)

While the *Gentile* case involved an attorney's speech in anticipation of his client's pending criminal trial, the Chief Justice's majority opinion discussed attorney First Amendment rights, apart from the trial setting:

Even in an area far from the courtroom and the pending of a case, our decisions dealing with a lawyer's right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics, have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses. *Id.* at 1073, 111 S.Ct. at 2744.

On the other hand, the Chief Justice's majority opinion also noted, that while "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press" *Id.* at 1074, 111 S.Ct. at 2744, any regulation of attorney speech should be narrowly tailored:

> The regulation of attorneys' speech is limited—it applies only to speech that is substantially likely to have a materially prejudicial effect; *it merely postpones the attorney's comments until after the trial.* While supported by the substantial state interest in preventing prejudice to an adjudicative proceeding by those who have a duty to protect its integrity, the rule is *limited on its face to preventing only speech having a substantial likelihood of materially prejudicing that proceeding.* *Id.* at 1076, 111 S.Ct. at 2745. (emphasis added).

This language comes down very strongly on the side of protecting attorney free speech outside of the trial courtroom that does not have a substantial likelihood of materially prejudicing a trial. This Court notes that the AGC complaint does not allege, in any of the three counts, that Mr. Fieger's speech was likely to have any likelihood of prejudicing any proceeding.

Justice Kennedy's majority opinion[6] analyzed the Nevada prosecution under the

---

his political agenda translating into his judicial decisions."

5. The Gentile decision contained two separate majority opinions. Chief Justice Rehnquist authored a majority opinion as to certain aspects of the case, while Justice Kennedy authored a majority opinion as to other aspects of the case.

6. That portion of the majority opinion authored by Justice Kennedy, joined by a majority of Justices, struck down, on the doctrine of void for

vagueness, Nevada Supreme Court Rule 177(3), a safe harbor provision that misled Attorney Gentile" into thinking that he could give his press conference without fear of discipline." *Id.* at 1048, 111 S.Ct. at 2731. Rule 177(3)(A) provides that "a lawyer may state without elaboration ... the general nature of the defense." *Id.* at 1048, 111 S.Ct. at 2731. Gentile had been prosecuted for violating Nevada Court Rule 177(1), which prevented an attorney from making "an extrajudicial statement that a reasonable person would

First Amendment's prohibition against vague regulation of speech which "is based in part on the need to eliminate the impermissible risk of discriminatory enforcement, for history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law." *Id.* at 1051, 111 S.Ct. at 2732.

Justice Kennedy emphasized that "one central point must dominate the analysis: this case involves classic political speech." *Id.* at 1034, 111 S.Ct. at 2724. Justice Kennedy continued:

> the State Bar of Nevada reprimanded petitioner for his assertion supported by a brief sketch of his client's defense, that the State sought the indictment and conviction of an innocent man a "scapegoat," and had not "been honest enough to indict the people who did it; the police department, crooked cops." At issue here is the constitutionality of a ban on political speech critical of the government and its officials.[7]

Justice Kennedy phrased the issue, in *Gentile,* in these terms:

> The question is not whether discriminatory enforcement occurred here, and we assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility. The inquiry is of particular relevance when one of the classes most affected by the regulation is the criminal defense bar, which has the professional mission to challenge actions of the state. Petitioner, for instance, succeeded in preventing the conviction of his client, and the speech in issue involved criticism of the government. *Id.* at 1051, 111 S.Ct. at 2732.

That issue is present in the instant case where the AGC has brought Plaintiff's speech before the ADB.

The Supreme court, per the Chief Justice's majority opinion adopted the following test

with regard to attorney statements in a pending case:

> We agree with the majority of the States that the "substantial likelihood of material prejudicial" standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the state's interest in fair trial.

> .    .    .    .    .

> [T]he rule is limited on its face to preventing only speech having a substantial likelihood of materially prejudicing that proceeding. *Id.* at 1075–76, 111 S.Ct. at 2745.

In the instant proceedings, Plaintiff, Geoffrey Fieger, Esq. is charged with violating eight different provisions of the Michigan Court Rules and/or Michigan Rule of Professional Responsibility, specifically MCR 9.104(1)–(4); MRPC 8.2(a) and 8.4(a)–(c).

Rule 8.2(a) of the Michigan Rules of Professional Responsibility states:

> (a) A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer, or of a candidate for election of appointment to judicial or legal office.

A noted treatise analyzed an identical Rule 8.2(a) in these terms:

> Rule 8.2(a) incorporates the First Amendment standard for criticism of public officials, as articulated by the Supreme Court in *New York Times v. Sullivan* and its progeny. A public official may not recover in libel or slander unless there is proof that the speaker either knew the statement was false or spoke with reckless disregard for the truth. This same stringent standard should apply to other potential sanctions (such as discipline) lest robust

---

expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing a judicial proceeding," *Id.* at 1033, 111 S.Ct. at 2723.

7. Chief Justice Rehnquist also noted the importance of First Amendment free speech in the context of the criminal justice system:

[T]he criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system. The way most of them acquire information is from the media. *Id.* at 1070, 111 S.Ct. at 2742.

speech be chilled. Hence, Rule 8.2(a) is limited to matters of fact that can be proven false, as is the case with libel and slander. Whether a statement purporting to be an opinion is actually intended as one of fact is itself a question of fact. *Hazard and Hodes,* The Law of Lawyering, 2d ed. (1993 Supp.) Vol II, P. 934.

Rule 8.2(a) was upheld against a disciplined attorney's First Amendment challenge by the U.S. Court of Appeals for the Ninth Circuit in *U.S. District Court v. Sandlin,* 12 F.3d 861 (9th Cir.1993):

[O]nce a lawyer is admitted to the bar, although he does not surrender his freedom of expression, he must temper his criticisms in accordance with professional standards of conduct.

. . . .

WSRPC 8.2(a) does not prohibit all lawyer criticism of judges, only that which is false or is made with reckless disregard for its truth or falsity. *Id.* at 866.

The Ninth Circuit upheld the sanction against the attorney based upon the district court finding:

*as a factual matter* that at the time he made the statements . . . Sandlin had no reasonable basis in fact for making those statements. Sandlin's statements to USA Lamp, the district court concluded, were made without any basis in fact and with reckless disregard as to the truth thereof. The district court did not err in its findings. *Id.* at 867. (emphasis in original)

This Court notes that all three counts of the AGC complaint do not rely solely upon MRPC 8.2(a). Each count also charges Plaintiff with violating seven additional provisions; MCR 9.104(1)–(4); MRPC 8.4(a)–(c).

MCR 9.104(1)–(4) states:

"The following acts . . . by an attorney . . . are misconduct and grounds for discipline . . .:

(1) conduct prejudicial to the proper administration of justice;

(2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;

(3) conduct that is contrary to justice, ethics, honesty, or good morals;

(4) conduct that violates the standards or rules of professional responsibility adopted by the Supreme Court.

MRPC 8.4(a)–(c) state:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another:

(b) engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer;

(c) engage in conduct that is prejudicial to the administration of justice.

This Court notes that, in the paragraphs preceding each of the AGC's listing of the above-listed violation provisions, the AGC has incorporated the *New York Times v. Sullivan* standard into the charges, thereby narrowing the charges against Plaintiff in two significant ways.

First, the AGC requires that Plaintiff's statements must have met the *Sullivan* standard, the statements must be false, and known by him to be false, or made with reckless disregard as to their truth or falsity.

Second, by applying the *Sullivan* standard, the AGC acknowledges that Plaintiff can only be subjected to discipline for statements of fact, not statements of opinion since statements of opinion cannot be found to be false.

Nevertheless, the Court notes that the language of both MCR 9.104(1)–(3) and MPRC 8.4(a)–(c) raise First Amendment concerns as to overbreadth and vagueness. It may well be difficult to discern with certainty and specificity just what amounts to "conduct prejudicial to the proper administration of justice," or "conduct that exposes the . . . courts to obloquy, contempt, censure or reproach," or "conduct that is contrary to justice, ethics, honest, or good morals." A recent Federal Court decision dealt with this issue.

In *Standing Committee on Discipline v. Yagman*, 856 F.Supp. 1384 (D.C. CA 1994) a three Judge Court dealt with that Federal District Court's Local Rule 2.5.2, which states:

> No attorney shall engage in any conduct which degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice therein. *Id.* at 1388.

That attorney had been disciplined for statements to the press charging a Federal District Judge with anti-Semitism, being drunk on the bench, ignorant, dishonest, ill-tempered and a bully. *Id.* at 1386. That Court's Local Rule 2.5.2 utilized terminology similar to Michigan Court Rule 9.104(1), ("conduct prejudicial to the proper administration of justice"); (2) ("conduct that exposes … the courts to obloquy, contempt censure, or reproach"); and MRPC 8.4(c) ("conduct that is prejudicial to the administration of justice").

The three judge court noted that the Local Rule raised First Amendment concerns:

> Local Rule 2.5.2 on its face, raises overbreadth concerns. A statute is overbroad if, in addition to prosecuting activities which constitutionally may be forbidden, it also sweeps within its coverage protected activities. Under the broad terms of Rule 2.5.2, truthful statements that impugn the integrity of a judge are sanctionable. Thus, for example, an attorney who accurately reveals a judges illegal act could be sanctioned. *Id.* at 1389. (citations omitted).

The solution adopted by the three judge court was to give a saving construction to Rule 2.5.2; "such a construction is appropriate if there is a core of easily identifiable and constitutionally prescribable conduct that the statute forbids." *Id.* at 1389. The Court interpreted Local Rule 2.5.2 in accord with the Supreme Court's standard for defamation actions set forth in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); "where the speaker acts with 'actual malice,' that is with knowledge that his statement was false or with reckless disregard for its truth or falsity." *Id.* at 1390.

In the instant case, this Court is not required to consider whether to reach out for a saving construction of MCR 9.104(1)–(3) and MRPC 8.4(a)–(c), because the AGC complaint includes the *Sullivan* limitation in each of the three charges against Plaintiff. As to MRPC 8.2(a), the *Sullivan* limitation standard is contained in the text of that Rule.

The three-judge California federal court described its standard for evaluating the attorney's conduct in these terms:

> Under this objective standard, a statement is reckless if made without any reasonable basis in fact. Ignorance is not bliss; an attorney has an obligation to conduct a factual inquiry prior to speaking. *Id.* at 1390.

The court concluded:

> the charges, in particular the accusations of dishonesty, drunkenness and anti-semitism, cannot be dismissed as statements of opinion that are protected by the First Amendment, they contain provable false factual connotations and are not rhetorical hyperbole. To say that a judge has a penchant for sanctioning Jewish attorneys is a simple and direct accusation of bias. It is provably false since it is possible to determine empirically whether the judge imposes sanctions in a disproportionate fashion. Similarly, the charges of drunkenness and dishonesty plainly imply past improprieties…. Thus, unless Respondent had an objectively reasonable basis for his accusations against Judge Keller, he is subject to discipline for those statements…. *Id.* at 1391 (citations omitted).

At the same time, the three-judge Court recognized the problem inherent in sanctioning an attorney for speech:

> It is a rare and unfortunate day when the judges of this district must sanction an attorney for conduct involving criticism of the bench, *Robust debate regarding judicial performance is essential to a vital judiciary.* If an attorney, after reasonable inquiry, has comments about a judicial officer's fitness for service, he or she may and should express them publicly. Conversely, baseless factual allegations contribute nothing to judicial accountability and undermine public trust in the courts. *Id.* at 1395. (emphasis added).

The ultimate First Amendment issue to be decided by the ADB is whether Plaintiff's conduct constitutes First Amendment robust debate or professional misconduct, in violation of the cited Michigan Rules, but limited by the AGC's *Sullivan* standard contained in each charge.

This Court has examined MCR 9.104(1)–(4) and MRPC 8.4(a)–(c) in the face of the assertions, in Plaintiff's complaint, of being unconstitutionally vague and void on their face and vagueness and overbreadth, generally.

In conducting this examination, the court has noted the recent Sixth Circuit decision, *Triplett Grille v. City of Akron*, 40 F.3d 129 (6th Cir.1994) # 93–3418, November 14, 1994, in which the court struck down a City of Akron ordinance banning nude dancing "as facially unconstitutional under the First Amendment overbreadth doctrine." The Sixth Circuit noted both the importance of the "overbreadth doctrine" to First Amendment jurisprudence, and the fact that the statute or rule can be challenged on its face:

> As this Court has recognized, the "overbreadth doctrine constitutes an exception to traditional rules of standing and is applicable only in First Amendment cases in order to ensure that an overbroad statute does not act to 'chill' the exercise of rights guaranteed protection." Under the doctrine, "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it threatens others' not before the court— those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid. While the overbreadth doctrine is "strong medicine" that is used "sparingly and only as a last resort," a plaintiff may prevail on a facial attack by demonstrating there is a realistic danger that the statute itself will significantly compromise recognized First Amendment protection of parties not before the Court." *Id.* at 135 (citations omitted).

Thus, the Plaintiff in this case has properly raised this First Amendment challenge to the rules at issue in this case, apart from the question of whether his statements were actionable.

The Sixth Circuit has pointed out:

> It is well settled that a chilling effect on one's constitutional rights constitutes a present inquiry in fact. *G & V Lounge v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir.1994).

The Court of Appeals noted that:

> it is well established that the federal courts are an appropriate forum for the redress of constitutional violations, regardless of the adequacy of state courts as an alternate forum. . . . ("A federal court may not simply disregard a constitutional challenge by invoking abstention, even though a remedy may also be in state courts") *Id.* at 1077 (citations omitted).

Finally, the Sixth Circuit emphasized well settled Supreme Court precedent:

> "The loss of first Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality). *Id.* at 1078.

■ While the language of MCR 9.104(1)–(3), and MRPC 8.4(a)–(c), may raise concerns as to overbreadth and vagueness—will the language chill attorneys from exercising their First Amendment rights to engage in robust criticism of judges and other public officials—given the fact that the instant AGC complaint contains the Supreme Court's *Sullivan* limitation standard, the Court will not reach out to strike them down on grounds of vagueness or overbreadth. Accordingly, this Court will reject Plaintiff's request for a preliminary injunction, and further reject, at this time the suggestion that those provisions be struck down as unconstitutional on First Amendment grounds.

This Court notes that Counsel for the AGC has stated at the federal court hearing on November 28, 1994, that it will join with Plaintiff if he seeks a motion for superintending control or mandamus to the Michigan Supreme Court to address, early-on, these First Amendment issues.

## EQUAL PROTECTION/SELECTIVE PROSECUTION ISSUES

■ As to Plaintiff's allegation of a violation of his right to equal protection of the law, and his assertion of selective prosecution, the Court notes from the pleadings that the Governor of the State of Michigan, a member of the State Bar of Michigan, recently described a Michigan Circuit judge as a "lunatic," and further stated "I think he got his law degree from a mail-order law school." These remarks would appear to clearly violate the same provisions which the AGC has utilized in bringing its charges against Plaintiff. Yet, despite having received a letter of complaint from the aggrieved judge, the AGC did not even request an investigation ("the Commission directed that this Request for Investigation be dismissed"). In closing its file, the Commission wrote to the Governor (Attachment 2) stating that the AGC "wishes to caution you regarding the adverse consequences that derogatory remarks such as those made by you ... can have on the entire legal system of this state," but in the very next sentence dissipating that caution, by voicing its confidence in the Governor, and then urging him to not hesitate to call if the AGC can be of further assistance:

> As you are a licensed attorney, the Commission is confident that you share its concerns in this regard.
>
> If I can be of further assistance to you, please do not hesitate to call.

It is not clear to this Court what further assistance the AGC wished to provide to the Governor after dismissing the Judge's complaint. What is clear, is that in the face of these obviously extreme remarks, the AGC took no action against the Governor, not even opening an investigation or censoring him, and then sought to assist him even further.

While the Court finds that the AGC's action with regard to the complaint against the Governor for his single incident raises questions of equal protection/discriminatory enforcement, based on the facts presented to this Court, the Court does not find sufficient evidence to conclude that Plaintiff, who has been charged with conduct based on three incidents, has made out a claim of an equal protection/selective prosecution violation.[8]

## CONCLUSION

This Court holds that:

(1) it will not abstain from dealing with Plaintiff's complaint;

(2) it will not grant a preliminary injunction enjoining the AGC from prosecuting its complaint against Plaintiff before the ADB;

(3) it will continue to exercise its jurisdiction over this case and will provide judicial review if the Michigan Supreme Court refuses to provide the meaningful judicial review required by the due process clause of the Federal Constitution;

(4) MCR 9.104(1)–(4); and MRPC 8.2(a) and 8.4(a)–(c), do not violate the First Amendment vagueness overbreadth doctrines in this case, in particular given that each count of the AGC complaint limits the conduct subject to discipline to factual statements violative of the Supreme Court's *Sullivan* standard; and

---

**8.** As to the issue of selective prosecution, the Sixth Circuit has noted that the party making that claim

> ... bears the heavy burden of establishing, *at least prima facie*, (1) that while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, *and* (2) that the government's discriminatory selection of him has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of his constitutional rights. *U.S. v. Hazel*, 696 F.2d 473, 474 (6th Cir.1983).

The Supreme Court has noted that:

> It is appropriate to judge selective prosecution claims according to ordinary equal protection standards. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

A treatise on Constitutional Law notes:

> The Government does not engage in selective prosecution in violation of the first amendment unless its enforcement policy is discriminatory on its face, or has a discriminatory effect *and* was motivated by a discriminatory purpose. Nowak and Rotunda, *Constitutional Law*, 4th Ed.1991, Page 1115.

Based on the facts before the Court, there is not sufficient evidence that the AGC's enforcement policy is discriminatory on its face, or that it was motivated by a discriminatory purpose.

(5) the facts presented to this Court do not support the finding of a constitutionally-based equal protection/selective prosecution violation.

## ATTACHMENT I

### STATE OF MICHIGAN
### ATTORNEY DISCIPLINE BOARD

Case No. 94–186–GA

GRIEVANCE ADMINISTRATOR

Attorney Grievance Commission,

STATE of MICHIGAN

Petitioner,

vs.

GEOFFREY N. FIEGER, P–30441,

Respondent.

### *FORMAL COMPLAINT*

PHILIP J. THOMAS, Grievance Administrator, Attorney Grievance Commission, upon information and belief, states the following:

1. Respondent, Geoffrey N. Fieger, P–30441, was licensed to practice law in Michigan in 1979, and by virtue of said license is a member of the State Bar of Michigan who is subject to the jurisdiction of the Michigan Supreme Court and the Attorney Discipline Board in matters of discipline for professional misconduct.

2. Respondent maintains an office for the practice of law in the County of Oakland, State of Michigan.

3. As an attorney subject to the rules and regulations of the Michigan Supreme Court, Respondent is subject to the standards for discipline set forth in MCR 9.104.

### *COUNT ONE*

4. On or about January 27, 1993, Eric Davidson, who had been convicted of murder, allegedly raped a female guard at E.C. Brooks Regional Correctional Facility in Muskegon, Michigan.

5. Mr. Davidson was transferred to the Ionia Correctional Facility the night of the alleged assault.

6. On or about January 31, 1993, prison guards discovered Mr. Davidson's body hanging from a bed sheet in his prison cell.

7. In February 1993, following an autopsy and investigation, the Department of Corrections, Michigan State Police, and Ionia Prosecutor's Office concluded that Davidson's death was a suicide.

8. At or about this time, Respondent was retained to represent Mr. Davidson's family in civil litigation related to his death.

9. As an attorney subject to the rules and regulations of the Michigan Supreme Court, Respondent is charged, *inter alia*, with the following duties and responsibilities:

a) To refrain from engaging in conduct prejudicial to the proper administration of justice;

b) To refrain from engaging in conduct which exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;

c) To refrain from engaging in conduct that is contrary to justice, ethics, honesty, or good morals;  and,

d) To refrain from making a statement he knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer.

10. Respondent violated his duties and responsibilities in that in February 1993, during his representation of the Davidson family, he publically accused the Ionia County Prosecutor of failing to investigate and covering up murder, as follows:

a) He stated, "As far as I'm concerned the prosecutor is engaged in a cover-up.";

b) He stated, "The prosecutor has done nothing in this investigation. He's covering up a murder.";

c) He stated, "This is a cover-up. It's an old style vigilante lynching. I think the suggestion of suicide is preposterous. He [Davidson] was murdered.";

d) He stated, "I believe the State of Michigan is participating in a conspiracy to cover-up murder.";  and,

e) He stated, "Michigan is now a state where high government officials call suicide a homicide—if you get my drift—and call homicide a suicide."

11. Respondent's statements concerning the Prosecutor's involvement in a conspiracy to cover-up murder were false, and were known by Respondent to be false at the time they were made, or were made with reckless disregard as to their truth or falsity and called into question the integrity of a public legal officer. There was no reasonable basis in fact for Respondent to make the statement that the prosecutor was engaged in an unlawful conspiracy to conceal a crime in connection with Mr. Davidson's death.

12. Respondent's conduct, as set forth in Count One of this Complaint, constitutes professional misconduct, in violation of MCR 9.104(1)–(4); and the Michigan Rules of Professional Conduct, to wit: 8.2(a) and 8.4(a)–(c).

### COUNT TWO

13. On or about March 22, 1993, on behalf of the plaintiff, Respondent filed a civil action entitled, *Cheryl Gale v. Lynn Mills, et al,* Wayne County Circuit Court Case No. 93–308305 NO.

14. At all times relevant hereto, defendant Lynn Mills was represented in the case by attorney Constance Cumbey.

15. At all times relevant hereto, the Honorable Marvin Stempien presided over the case.

16. On or about December 14, 1993, Judge Stempien issued an opinion dismissing the lawsuit due to the plaintiff's failure to provide discovery.

17. In January 1994, Judge Stempien's daughter, attorney Lisa Stempien, commenced employment with the law offices of Constance Cumbey.

18. As an attorney subject to the rules and regulations of the Michigan Supreme Court, Respondent is charged, *inter alia,* with the following duties and responsibilities:

a) To refrain from engaging in conduct prejudicial to the proper administration of justice;

b) To refrain from engaging in conduct which exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;

c) To refrain from engaging in conduct that is contrary to justice, ethics, honesty, or good morals; and,

d) To refrain from making a statement he knows to be false, or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer.

19. Respondent violated his duties and responsibilities in that in December 1993 and January 1994, he publically stated that Judge Stempien had conspired with Ms. Cumbey to dismiss the *Gale* case in exchange for Ms. Cumbey providing employment for Judge Stempien's daughter. With respect to the alleged conspiracy, Respondent stated, "This is an act of monumental judicial corruption that has got to be investigated." Respondent also stated, "His [Judge Stempien's] acts indicate as corrupt a judicial temperament as one could possibly imagine."

20. Respondent's statements that Judge Stempien was involved in a conspiracy concerning the dismissal of the *Gale* case were false, and were known by Respondent to be false at the time they were made, or were made with reckless disregard as to their truth or falsity and called into question the integrity of a judicial officer. There was no reasonable basis in fact for Respondent to make the statements that Judge Stempien had conspired with defense counsel to dismiss the *Gale* case.

21. Respondent's conduct, as set forth in Count Two of this Complaint, constitutes professional misconduct in violation of MCR 9.104(1)–(4); and the Michigan Rules of Professional Conduct, to wit: 3.5(c); 8.2(a) and 8.4(a)–(c).

### COUNT THREE

22. On or about May 10, 1994, a panel of the Court of Appeals issued an opinion in

which they declared the State ban on assisted suicide unconstitutional. The court reinstated the murder charges against Respondent's client, Dr. Jack Kevorkian, concerning the 1991 deaths of two women.

23. As an attorney subject to the rules and regulations of the Michigan Supreme Court, Respondent is charged, *inter alia,* with the following duties and responsibilities:

a) To refrain from engaging in conduct prejudicial to the proper administration of justice;

b) To refrain from engaging in conduct which exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;

c) To refrain from engaging in conduct that is contrary to justice, ethics, honesty, or good morals; and,

d) To refrain from making a statement he knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer.

24. Respondent violated his duties and responsibilities in that on May 11 and 12, 1994, he publically attacked the qualifications and integrity of the judges who participated in the Court of Appeals' decision involving his client, as well as justices of the Michigan Supreme Court, as follows:

a) In response to a comment by the media that Respondent, in reaction to the Court of Appeals' decision, had reportedly publically called everybody in the Michigan judiciary stupid, Respondent stated, "No, not everybody, just two people, amazingly stupid, one of whom is the attorney—Governor Engler's attorney, her husband (Clifford Taylor) was one of the judges.";

b) With respect to Judge Taylor, Respondent also stated, "We knew exactly what he was going to do from the moment he was sitting on this case. He lost for the attorney generalship, Governor Engler appointed him to the Michigan Court of Appeals as a political plum, and we knew

what he was going to do from the very beginning.";

c) He further stated, referring to judges sitting on the Court of Appeals panel which decided the case, "[W]hat's so shameful in this state, where we got judges appointed to the bench who have never practiced law, they have no idea of what they are doing.";

d) Respondent also stated, with respect to these judges, "That's how—I mean our judiciary is laughed at in the rest of the country. It's not cited in any other state court or federal court decisions. We have no Cardosos, we have no learned Hands, we have no Brandices, we got nobody. We got political hacks, we got Robert Griffin, a failed Senator who retires and gets—a former Lieutenant Governor. We got all these people and we got nobody who knows the law sitting in the higher court judiciary.";

e) Respondent stated, "Cliff Taylor and Fitzgerald, you know I don't think they ever practiced law, I really don't. I think they got a law degree and they said, well it will be easy to get a—they get paid $120,000 a year, you know, and people vote on them, you know, when they come up for election, and the reason they keep getting elected because they're the only elected officials in the state who get to have an incumbent designation, so when you go into the voting booth and it says 'Cliff Taylor', it doesn't say failed Republican nominee for attorney general who never had a job in his life, who's wife is Governor Engler's lawyer, who got appointed when he lost, it says 'Cliff Taylor incumbent judge of the Court of Appeals', and they vote for him even though they don't know him. The guy could be Adolph Hitler, as long as he changes his name and it says 'incumbent judge' he gets elected."; and,

f) Respondent stated, concerning Judge Taylor, "[T]his guy has a political agenda ... I knew in advance what he was going to do... We know his wife is Governor Engler's Chief Counsel. We know his wife advise (sic) him on the law. We know—we knew—what he was

going to do in advance, and guess what, he went right ahead and did it. Now you can know somebody's political agenda affects their judicial thinking so much that you can predict in advance exactly what he's going to do ... his political agenda translating into his judicial decisions."

25. Respondent's statements concerning these judges/justices were false and were known by Respondent to be false at the time they were made, or were made with reckless disregard as to their truth or falsity. There was no reasonable basis in fact for Respondent to make the statements that the judges/justices in question were unqualified/lacked experience or were predisposed in the matter.

26. Respondent's conduct, as set forth in Count Three of this Complaint, constitutes professional misconduct in violation of MCR 9.104(1)–(4); and the Michigan Rules of Professional Conduct, to wit: 3.5(c); 8.2(a) and 8.4(a)–(c).

27. Each of the acts and omissions set forth above constitute a separate breach by Respondent of his duty to conduct himself at all times, both personally and professionally, in conformity with the standards imposed upon members of the Bar as conditions for the privilege of practicing law in this State.

WHEREFORE, Respondent should be subjected to such discipline as may be warranted by the facts and circumstances of such misconduct.

Dated: Detroit, Michigan

October 12, 1994

/s/ Philip J. Thomas

Philip J. Thomas (P–31298)
Grievance Administrator

/s/ Joan P. Vestrand

Joan P. Vestrand (P–37062)
Associate Counsel
Attorney Grievance Commission
Suite 256, Marquette Building
243 West Congress
Detroit, Michigan 48226
(313) 961–6585

ATTACHMENT II

EXHIBIT N

State of Michigan

Attorney Grievance Commission

SUITE 256, MARQUETTE BUILDING

243 WEST CONGRESS

DETROIT, MICHIGAN 48226

TELEPHONE (313) 961–6585

TELEFAX (313) 961–5818

February 7, 1994

LEGAL COUNSEL FEB 14 1994

*PERSONAL AND CONFIDENTIAL*

Governor John M. Engler

2520 Oxford Road

Lansing, Michigan 48911

RE: Hon. James R. Giddings as to John M. Engler

File No. 3309/93

Dear Governor Engler:

The complaint of the Hon. James R. Giddings was filed with the Attorney Grievance Commission on November 1, 1993 alleging improper conduct on your part.

The undersigned investigated this matter by carefully reviewing all statements and documentation submitted by the parties. The results of the investigation, along with a recommendation, were submitted to the Commissioners for their review and decision.

The Attorney Grievance Commission determined that the matter did not warrant further action by the Commission. Therefore, pursuant to MCR 9.114(A), the Commission directed that this Request for Investigation be dismissed.

While this file is being closed, the Commission wishes to caution you regarding the adverse consequences that derogatory remarks such as those made by you against Judge James Giddings, can have on the entire legal system of this state. As you are a licensed attorney, the Commission is confi-

dent that you share its concerns in this regard.

If I can be of further assistance to you, please do not hesitate to call.

Yours very truly,

/s/ Joan P. Vestrand

Joan P. Vestrand
Associate Counsel

JPV/bv

cc: Hon. James R. Giddings